# Russell's Appeal.

1. In contemplation of marriage and with the consent of the intended husband a woman acting under advice of counsel made a deed of settlement of all her estate, excepting a specified amount which she retained for her own use, the trustees to pay her the income for her separate use for life and after her death to convey the estate to her children according to testamentary appointment, excepting such provision for her husband as she might make by will out of the income; if she left no issue, then to convey to her sisters and brother or their issue as she might appoint; should she leave no will, half the income to go to the husband for life; and half for her children; if she left no issue or leaving any they should die minors without issue, to convey the estate to her brother and sisters in fee; there was no power of revocation in the settlement, nor did the wife at its execution understand that her power of appointment was restricted to her brother and sisters, but believed that if she survived her husband she could dispose of her estate as she pleased. She gave no instructions as to power of revocation or of general testamentary disposition—there was "total silence on the subject." The wife survived the husband, who died leaving no issue of the marriage. Held, that the absence of the power of revocation being under the circumstances a mistake, and the provisions after death of the husband being without consideration and the beneficiaries volunteers, the wife was entitled to relief in equity and it was decreed that the trustees should reconvey the trust estate to her.

2. One may dispose of his property gratuitously, if not in prejudice of creditors, and, if with intention and knowledge of the act, it is irrevocable in law and equity if power of revocation is not reserved.

3. The mere omission of counsel to advise the insertion of a power of revocation is not ground to set aside a voluntary conveyance.

4. The absence of the power of revocation in the deed and failure of counsel to advise it are circumstances with others to show that the act was not done with a deliberate will.

5. Where the facts show that the deed was executed without advice or reflection or intention to bind after the reasons for executing it have passed, and the party is again sui juris, equity will relieve against volunteers claiming without consideration or a reasonable motive for continuing the donor's disability.

6. The deliberate intention of a party to tie up his hands should clearly appear.

7. In the absence of a certain intent to make the gift irrevocable—the

[Russell's Appeal.]

omission of a power to revoke is primâ facie evidence of mistake, and casts the burden of supporting the settlement on volunteer claimants without consideration.

8. In such case the mistake being one of fact mixed with the legal effect, equity will use the mistake of fact as a means of relief.

9. Gross *v.* Leber, 11 Wright 520; Whelen's Appeal, 20 P. F. Smith 410, recognised.

January 11th 1874.    Before AGNEW, C. J., MERCUR and GORDON, JJ.    SHARSWOOD, J., at Nisi Prius.

Appeal from Nisi Prius, In Equity: No 4, to July Term 1872.

The bill in this case was filed, April 20th 1872, by Emma Louisa Evans against Winfield S. Russell and Edwin T. Eisenbrey, trustees under the marriage settlement of the said Emma, Mary Ann Potter, Stephen B. Fotterall, Sarah E. Fotterall, Sarah K. Fotterall and the said Winfield S. Russell and Catharine S. Russell in her right.    On the 15th of May 1872, the defendants put in their answer, and replication was filed the same day.

Samuel Robb, Esq., was appointed examiner and master to report upon the law and the facts and the decree proper to be made thereon.

The substance of the bill and answer is set out in the report of the master, which is directed to be reported with the opinion of the Supreme Court; he took testimony and found the facts in his report.

He reported as follows:—

" The bill sets forth : 1. That by indenture of marriage settlement, dated May 31st 1866, and duly recorded at Philadelphia, reciting that a marriage was about to be celebrated between the plaintiff, then Emma Louisa Fotterall, and William Elbert Evans, and that it was agreed between them that each should retain the exclusive control of their respective property after marriage, except as might be permitted by each to the other as to income received or by testamentary disposition, it was witnessed, for the purpose of carrying out said intention, &c., that the plaintiff, by and with the consent of the said Evans, did grant and convey unto Winfield S. Russell, one of the defendants, and the said Evans all her property and estate (with the exception of $30,000 to be retained out of her personal estate by the said Russell and to be paid by him to her for her own proper use), *in trust*, after the said marriage, to collect the income thereof and pay the same to her for her sole and separate use for life, with certain powers of sale and investment, and, after her death, to convey the subjects of the trust to and among her children and issue, according to her testamentary appointment (excepting therefrom such provision out of the income thereof as she should by will make for her said husband for life); but in case she should leave no child, or issue of any child, living at her death, then, subject to such provision for her said husband as she might make, *in trust*, to convey the same to

and among her sisters and brother, or to their children or issue, for such estate and interest, as she, whether married or single, should, by will, limit and appoint.    But should she leave no will, or appointment in the nature thereof, then, after her decease, *in trust*, to hold and convey the said property, as to one-half of the net income thereof, for the use of the said Evans for life, and the other half thereof for the use of her children, or child, in the manner therein set forth; but if she should leave no child, or the issue thereof, to survive her, or, if leaving such, all should die during minority leaving no issue, then, *in trust*, to convey the said property among the defendants, Mary Ann Potter, Catharine S. Russell, and Stephen B. Fotterall, her sisters and brother, in fee, share and share alike, and to the issue of any of them then deceased, but subject, however, to the payment of the said one-half of the income to the said Evans for life, and also subject to the payment of half of the net income to the defendant Sarah E. Fotterall, another sister, for life, out of which should be paid $600 per annum unto her mother, the defendant Sarah K. Fotterall, during her life.    And should either trustee die, or otherwise cease to be trustee, the survivor, or, upon his default, any *cestuis que trust*, might and should petition the Court of Common Pleas to fill the vacancy with a nominated trustee, such appointment to be without security if a majority in interest should join in the petition; and upon such appointment being approved and made, all the title, trusts, &c., set forth and declared should become vested in such appointee as if originally made a trustee.

That the said indenture also contained covenants that the said Evans would not claim for his own benefit any of the estate of the plaintiff then owned or thereafter to be acquired by her, whether without or within the trusts of the said settlement, otherwise than as therein had been expressed to be given or granted, or should be bequeathed or devised under the powers in said settlement contained, or as income might be spent jointly during their lives, by mutual consent, after its payment over to plaintiff; and the plaintiff covenanted that she would not claim any dower, third part or statutory share, as widow or otherwise, of and in the estate of the said Evans, to which she relinquished all claim in the event of the said intended marriage and of her surviving him; and both of them, the plaintiff and the said Evans, further covenanted that they would at all times thereafter, if necessary, make further conveyances and releases as to the estate of the other, and to perfect title in any purchaser or grantee thereof.    And it was agreed that the said trustees should have power to make partition of the estate which might belong to the plaintiff in common or joint tenancy with others, with her consent while living and without her consent after her decease, and they and their successors should have and exercise the power of sale thereinbefore given, after her

25 P. F. SMITH—18

decease, without her consent, during the continuance of the said trust.

2. That said marriage was afterwards solemnized, and said Evans died on or about March 7th 1869, leaving surviving him his widow, the plaintiff, but no children or issue of the said marriage.

3. That under proceedings in the Court of Common Pleas of Philadelphia county, Edwin T. Eisenbrey was, on July 12th 1869, appointed trustee under said indenture, in place of said Evans, deceased.

4. That all the sisters and the brother and the mother of plaintiff are now living, and are parties defendant.

5. That the real intention of the parties to the said indenture was that the parties grantors should each retain the exclusive ownership and control of his or her property after marriage, and that the only consideration therefor was the said contemplated marriage; and that all the interests which were within this consideration have expired, so that the only parts of said settlement now subsisting are purely voluntary. It is further alleged that when the said settlement was executed, the plaintiff had no knowledge or belief other than that the settlement was drawn in the usual manner or form; that she gave no instructions other than that her property was to be settled free from the debts or control of her husband, and that she said nothing, nor was anything said to her, as to

First, There being no power of revocation reserved to her in any event, whether all the interests within the consideration of the marriage should or should not expire.

Secondly, There being no general power of even testamentary appointment in case she should survive her husband, and there should be no children of the marriage. And

Thirdly, There being no provision made for her choice or option in the matter of any change of trustees.

That the result is that the plaintiff, a widow and childless, is deprived of all power over her property while living, and has not even a power of testamentary disposition in favor of other persons or objects than her said mother, sisters and brother, or their children as aforesaid.

The plaintiff prayed for relief as follows:—

1. That it may be declared that the plaintiff is entitled to appoint and dispose of her estate, the subjects of the trusts of said indenture, as she may think proper, in priority to the trusts and limitations in favor of her mother, sisters and brother, or their children as aforesaid; or, in the alternative, that it be declared that the plaintiff is entitled to appoint and dispose of the same, in priority as aforesaid, by her last will, to such persons and for such estates as to her shall seem fit; and that in any event, any future

nomination of trustees shall be made with her consent and approbation, and that the said indenture be reformed accordingly.

2. General relief.

The defendants filed a joint and several answer, in which they say :—

1. That they admit the truth of the allegations contained in the first four paragraphs of the bill, but for greater certainty refer to the indenture of May 31st 1866.

2. That, with the exception of Winfield S. Russell, they have no personal knowledge as to the matters set forth in the fifth paragraph, and pray for proof thereof if material.   And Winfield S. Russell says that he was present at the conversations between the parties to said indenture, and the counsel who prepared the same, prior to its execution, and heard no other instructions given than are mentioned in said fifth paragraph ; and that the subject of a power of revocation, or of general testamentary appointment in default of issue, was not mentioned or discussed, but that he has no knowledge of what the plaintiff's intention on the subject was prior to the execution of the instrument, except from her subsequent declarations.

3. They submit that the circumstances set forth in the bill, if proved, do not make out any case for the reformation of the said indenture by the insertion either of a power of revocation or of one of testamentary appointment."

He found these facts :—

" The plaintiff, then Emma Louisa Fotterall, a daughter of William F. Fotterall, of Philadelphia, deceased, about 1862 became engaged to be married to William Elbert Evans, who had been a widower for a number of years, and had, by his prior marriage, two children living.   The plaintiff owned considerable property, real and personal, which she had inherited from her grandfather, Stephen E. Fotterall, and Mr. Evans was possessed of an independent estate.

About two years after the engagement of marriage, and seemingly contemplating its early celebration, Mr. Evans suggested to the plaintiff the advisability or propriety of her putting her property in trust.   For some unexplained reason this suggestion was not then acted upon, but about two years afterwards and when it was intended that the marriage should take place within a very short time, Mr. Evans renewed the suggestion ; and about ten days prior to the solemnization of the marriage, the plaintiff mentioned the matter to Mr. Winfield S. Russell, her brother-in-law, one of the defendants, stating to him that she had concluded to put her property in trust, and requesting him to act as her trustee.   He was at first reluctant to accept the trust, and advised her to appoint the Pennsylvania Company for Insurances on Lives and Granting Annuities as her trustee ; but, upon the plaintiff's expressing a de-

cided preference that he should act as trustee, he consented to do so. He then suggested to the plaintiff to appoint, as co-trustee, Mr. Edwin T. Eisenbrey (one of the defendants), intermarried with the plaintiff's cousin; but the plaintiff preferred that Mr. Evans should act in that capacity. To this Mr. Russell objected, for the reason that his relations with Mr. Evans were then of the most friendly character, and he feared that questions might arise in the management of the trust which might interrupt these relations; but after an interchange of views with Mr. Evans, Mr. Russell consented to act with him. The plaintiff then requested Mr. Russell to obtain for her a professional interview with Eli K. Price, Esq., by whom she intended that the deed of settlement should be prepared. When making this request, the plaintiff told Mr. Russell merely that she wanted her property put in trust, and Mr. Russell, when he called to arrange for the interview, gave no instructions to Mr. Price as to the settlement. Very shortly afterwards the plaintiff and Mr. Price had an interview at Mr. Russell's house, No. 1318 Spruce street, in the city of Philadelphia, in the dining-room, in the presence of Mr. and Mrs. Russell (the latter, plaintiff's sister and one of the defendants), Miss Sarah E. Fotterall (another sister and defendant), and, probably, Mrs. Mary Ann B. Potter (another sister and defendant). After consultation with Mr. Price, instructing him as to the settlement, and also as to her will which she wished him to prepare for her, the plaintiff went to Mr. Evans, who was in the house, but not in the dining-room, and informed him of what she had done ; and thereupon Mr. Evans went to the dining-room and gave instructions as to his own will to Mr. Price.

A few days afterwards, that is, on May 31st 1866, Mr. Price gave the deed of settlement to Mr. Russell, who took it and handed it to the plaintiff, who read it, so far as appears, for herself and by herself, and afterwards gave it to Mr. Evans who took it away with him for examination. Upon returning the deed to the plaintiff, Mr. Evans suggested to her that she had better inquire whether she could make her will as she pleased, saying it made no difference with regard to himself, and the plaintiff thereupon went to Mr. Russell who was then in his chamber, recovering from illness, and inquired of him whether she could make her will as she pleased, and Mr. Russell answered "yes." Mrs. Russell and Miss Sarah E. Fotterall were in the room at the time.

A few evenings afterwards, that is, on the evening of June 5th 1866, Mr. Price met the plaintiff and Mr. Evans and Mr. Russell, at Mr. Russell's house, to witness the execution of the deed. The plaintiff, in her instructions to Mr. Price, had directed him to except from the trust the sum of $30,000, without specifying any particular property from which the said sum should be derived or retained ; she wanted the absolute control of this sum for her own

use; Mr. Price thought $10,000 would be sufficient; the plaintiff said that she wanted $30,000; Mr. Price then suggested $20,000; but the plaintiff said "no," and insisted upon $30,000. In the draft of the deed only $20,000 had been excepted from the trust, "to be retained out of her personal estate," and the plaintiff having called Mr. Russell's attention to this mistake in the amount, Mr. Russell called Mr. Price's attention to it, and it was accordingly corrected. Mr. Russell then went out and brought in Alderman Tunison, and the deed was executed by the plaintiff and Mr. Evans and Mr. Russell, and witnessed by Mr. Price and the alderman; the plaintiff's sisters, Mrs. Russell and Miss Sarah E. Fotterall, being present.

On the next day, June 6th 1866, the plaintiff and Mr. Evans were married; and on the same day, but after the marriage, the plaintiff executed the will which Mr. Price by her instructions had prepared for her.

On March 7th 1869 Mr. Evans died, leaving no children or issue of the said marriage.

On June 12th 1869, Mr. Russell, as surviving trustee under the deed of marriage settlement, presented his petition to the Court of Common Pleas at Philadelphia, setting forth, inter alia, the said deed; the death of Mr. Evans; the necessity that a new trustee should be appointed in the place and stead of Mr. Evans, deceased; that a majority of the parties in interest had selected Edwin T. Eisenbrey for that purpose; and praying for the appointment of said Eisenbrey as said trustee. And the plaintiff here, with two of her sisters, Sarah E. Fotterall and Catharine S. Russell, being a majority of the parties in interest, by writing annexed to said petition, concurred in the prayer thereof, and desired that no security be required of the said Eisenbrey according to the provisions of the said deed. Whereupon the said court granted the prayer of the said petition and appointed the said Eisenbrey trustee without security.

About this time the plaintiff wished to make another will, disposing of her estate otherwise than was provided for in or permitted by the deed of settlement, and consulted with counsel for this purpose, by whom, after an examination of the deed, she was advised that she possessed no general testamentary power, and could not dispose of her property as she intended, or as she pleased, but that her power of appointment was restricted to her sisters and brother, or their children or issue.

It appears that the plaintiff, in executing the deed, did not understand that it would so operate; she had taken it for granted that, no instructions to the contrary having been given, she would have the right to do what she pleased with her estate in the event of her surviving her intended husband, and had thought that the trust would end at his death; and so had thought and understood

her sister, Miss Sarah E. Fotterall, who was present at the interview between the plaintiff and Mr. Price and at the execution of the deed; and Mr. Russell, to whose mind the question of the duration of the trust did not present itself until after the death of Mr. Evans, then supposed that the deed was revocable and took legal advice with a view to the plaintiff's revoking it.

At the interview and at the execution of the deed, neither the, parties nor counsel would seem to have contemplated the contingency of the plaintiff surviving her intended husband.    Nothing was said upon this subject by anybody, but everything would appear to have been considered and done upon the assumption that her intended husband would be her survivor.

The plaintiff's instructions as to the settlement were general, that she wanted her property, excepting $30,000, put in trust, and that after her death it should go to her intended husband, her mother, sisters and brother, as limited in the deed.    She gave no instructions as to a power of revocation, or as to a general testamentary power, either as to their insertion or omission.    She was not advised as to the necessity for their insertion if she wished to reserve them, nor was her attention called to their omission from the deed.    As to these matters there was "a total silence" both at the interview and at the execution of the deed, and also during the intermediate time, excepting when, as has been already stated, Mr. Evans suggested to her that she had better inquire whether she could make her will as she pleased, and when Mr. Russell, in perfect good faith, either misapprehending the question or misinterpreting the deed, answered her that she could do so.

There is nothing in the evidence, outside of the deed itself, showing, or from which it may be inferred, that the parties to the settlement meant that it should be irrevocable, or that a general testamentary power should not be reserved to the plaintiff, in the event of her surviving her intended husband.

It would appear that the principal if not the only material purpose of the settlement, as intended by the plaintiff and Mr. Evans, was to secure to the plaintiff the beneficial enjoyment and ultimate disposition of her estate, free from his influence and control; and it is quite clear that a general testamentary power, after Mr. Evans's death, was not inserted in the deed because the plaintiff was misled into the belief that under the deed she possessed such a power; and that a power of revocation, in the event of her surviving Mr. Evans, was not inserted, not because any objection to the reservation of such a power was expressed by her or him, or the plaintiff did not wish to reserve such a power, or the reservation of it might defeat the purpose of the settlement, but simply because intending that the trust should, and presuming that it would, continue only during Mr. Evans's life, and unadvised of the necessity for the insertion or the effect of the omission of this

power, she did not notice the omission and direct the insertion of it in the deed.

It would appear, too, that very little, if anything at all, was said upon the subject of the appointment of a trustee or trustees in the event of the death or resignation of the trustees in the deed or either of them, If anything at all was said, it is not pretended that the plaintiff was advised as to her right to reserve a power to choose such trustees, or to make their appointment subject to her consent and approval, or that she declined to reserve such a power, or that any objection was expressed to a reservation of it.

It remains to be stated in conclusion that the plaintiff did not receive the sum of $30,000 directed to be excepted from the trust, and to be retained under her own absolute control. Her personal estate amounted to only $14,500, and this is the whole amount she has received."

The master then proceeded to state his opinion as follows :—

" The marriage was the only consideration for this settlement, and there having been no children of the marriage and the husband being dead, the only part of the settlement now subsisting is purely voluntary and not within the consideration of the deed. The deed then, as to present interests involved, is to be treated as a voluntary deed, and the question is, upon what principles do courts of equity proceed in reforming or setting aside voluntary instruments?

" The only purpose of the settlement was to secure to the plaintiff, after marriage and during marriage, the enjoyment and disposal of her estate free from the influence and control of her husband. The suggestion of the settlement originated with him, not with her, and there is not even a pretence that it was inspired by a wish to procure for himself a corresponding independence as to his own private estate, or that it was prompted by any motive other than such as concerned the plaintiff and himself alone. The only intelligible explanation of his motive would seem to refer it to a desire on his part to testify his disinterested affection for the plaintiff. Excepting by referring it to this, or some other equally unselfish, motive, there is nothing to explain why the suggestion was originally made or afterwards repeated by him. It is not pretended that there was any interference in the matter by the plaintiff's family or friends, or that she or they deemed it advisable that her estate should be protected against the possible consequences of her husband's importunities or solicitations, or of any infirmities of character or habits in him or herself. On the contrary, so far as appears, neither her family nor friends had part or lot in the suggestion; they held the intended husband in high esteem; he had abundant means of his own and did not need and did not want her fortune or the control of it; and there was nothing in the character, habits or surroundings of either of them that could provoke a fear,

or even a doubt, as to the integrity of her estate in his or her own keeping. The evidence does not disclose any of the usual reasons for settlements or any reason at all, excepting only this, that the plaintiff concluded to make a settlement simply because her intended husband suggested it.

"In acting upon this suggestion, the plaintiff, it is clear, originally intended to do nothing more than to put her property beyond her husband's influence and control; that is, to put it in trust during his life. This was her chief and primary intention, and there is nothing to show that prior to her conference with counsel she had formed or expressed any other or further intention, excepting as to the trustees, or that at any time she entertained or expressed any intention inconsistent with this original purpose of her mind. The details of the settlement—how her intention could be carried into effect; what was to be done with her estate in the event of her leaving issue surviving; in the event of her not leaving issue; in the event of her dying intestate—were apparently worked out during the conference. It does not appear that she gave any specific instructions to her counsel as to the duration of the trust or that he made any specific inquiries on this subject. The contingency of her surviving her husband, if not entirely overlooked, was not contemplated by anybody with reference to its effects and consequences upon the terms of the settlement; and as to two important matters—a power of revocation and a general testamentary power—and probably as to a third matter—a power to select trustees—there was a 'total silence' which, if it did not continue 'total' to the end, was broken only to mislead her, innocently and in perfect good faith, it is true, but still to mislead her, as she was misled by Mr. Russell, into the belief that the deed reserved to her at least one of these very material powers—the power to make her will as she pleased.

"The learned counsel, by whom the deed was prepared, was examined as a witness. He testified, among other things, that he would not 'undertake to recall the conversation that took place' at the conference with the plaintiff; that he remembered 'getting her views,' but 'not any specific views from her;' that he did not remember 'any reference whatever to the fact of her surviving Mr. Evans, or what should be done in that event;' and that he had 'no recollection as to any instructions as to a power of revocation being inserted in the instrument.' And then, on cross-examination, he thus proceeds: 'My belief is, the deed contains everything I was instructed to insert; nothing was added or omitted, I believe. I believe the deed to be a fair transcript of what I understood her to desire. I must have asked her what she would have done with the property in case she did not make a will, and the limitation over to her brother and sisters must have been derived from her own expression of her wishes. I can't remember any special instruc-

tions as to the form of the power to appoint by will.  If she had expressed a wish for a general power of appointment, it would, of course, have been inserted.  I have had a very large experience in drawing of wills and marriage settlements, and I have always had a great aversion to the wife having a power of revocation or a general testamentary power, during the life of the husband, to subject her to the solicitations of her husband; I have a dislike to seeing property go out of a family; this, however, does not apply to cases where the marriage has ended by the death of the husband; and, in this instance, if a suggestion had been made of a power of revocation, or of a general testamentary power, I would freely have inserted it; there was a total silence on this subject.'

" This testimony, taken altogether, corroborating, as it does, the other testimony in the case, and the fact that the plaintiff meant that the trust should be operative only during the life of her intended husband, and the further fact that she was given to understand that the deed reserved to her a general testamentary power, would seem to establish that she was not fully advised as to the nature, effects and consequences of the settlement, and that she executed the deed under a mistake or misapprehension.

" Now, conceding, as is contended for the defendants, that a mistake of law cannot be corrected in equity, the decisions show that equity has considered the kind of mistake here sought to be corrected, not a mistake of law, but a mistake of fact, or of mixed law and fact, or something similarly relievable, or the rule invoked has not been held applicable to cases of this description.

" Instruments as solemn as the deed in this case, and executed as freely and deliberately as this deed was executed, have been reformed, or set aside, for just the very sort of mistake here disclosed.  No case precisely in point, in our own courts, was cited in the argument, and none, it is believed, can be found, but in the English Chancery the cases have been not unfrequent and the decisions have been rested on a broad basis, and relief, under circumstances such as have been exhibited by the proofs in this case, has seldom, if ever, been refused.  The first thing which the court seeks to discover is the intention of the settlor, and the deed is accepted as expressive or conclusive of that intention, only when it is shown that it was executed not only freely and deliberately but with full knowledge, and the *onus probandi* is on the party seeking to uphold it.  The general rule is, ' that in every transaction in which a person obtains by voluntary donation a benefit from another, it is necessary that he should be able to establish that the person giving him that benefit did so voluntarily and deliberately, knowing what he was doing, and if this be not done, the transaction cannot stand:' Cooke *v.* Lamotte, 15 Beav. 234.  According to Lord Eldon, in Huguenin *v.* Basely, 14 Vesey 293, the question is, whether the deed is the ' pure, voluntary, well under-

stood act' of the settlor's mind, and whether the settlor executed it with full knowledge of all its 'effects, nature and consequences,' or, as the Master of the Rolls, Sir John Romilly, puts it in Phillipson *v.* Kerry, 32 Beav. 628, 'whether the deed fully expresses the nature of the arrangement she (the settlor) wished to make, and whether its full import and effect were clearly and distinctly made known to her.' It is not enough to show that the settlor read the deed, or that it was read to him, or that he understood it 'as well as any unprofessional man could be supposed to do,' but it must be established that it was so explained to him that he might understand it (Nanney *v.* Williams, 22 Beav. 452), especially if any of the usual clauses are omitted (Wollaston *v.* Tribe, Law Rep. 9 Eq. 44), or any unusual clauses are inserted (Phillips *v.* Mullings, Law Rep. 7 Ch. Ap. 246). Nowhere is it authoritatively laid down just what clauses every deed of voluntary settlement should or should not contain ; each case must be judged by its own circumstances ; but there are certain clauses, the absence of which almost always arrests the attention of equity, and satisfactory proof is required that they were omitted intelligently and intentionally. Under circumstances where the insertion of them would not defeat the purpose of the settlement, or that purpose could be effectively accomplished without their omission, the absence of a general testamentary power has been held to be a serious defect, and the absence of a power of revocation has been held to be almost, if not quite, sufficient, of itself, to warrant the interposition of the court to reform, or even set aside, the deed, at the instance of the settlor. Not that the reservation of both or either of these powers is absolutely indispensable to the validity of a voluntary settlement even under such circumstances, but only that the settlor's attention should be called to them, and he should be advised about them, and made to understand them, and their absence should be satisfactorily explained by proof that the settlor declined to reserve them, or in some affirmative way signified his intention that they should not be reserved ; otherwise the inference will be more or less conclusive that he did not execute the deed with that full knowledge which he ought to have possessed. In Huguenin *v.* Basely (*ut supra*), Lord Eldon regards the absence of a power of revocation *as a circumstance* to be considered, and refers approvingly to Lord Hardwicke's opinion that the absence of such a power was to be looked upon as '*strong evidence* that the party did not understand the transaction.' In Nanney *v.* Williams (*ut supra*), the Master of the Rolls thought the want of such a power was *a strong circumstance* tending to establish want of competent knowledge, and he was of opinion that a party purposing to make a voluntary settlement should be asked, in the first place, whether he meant it to be revocable or irrevocable, and if revocable, in 'what way he intended the deed should be revocable.'

[Russell's Appeal.]

In Forshaw *v.* Welsby, 30 Beav. 243, the want of this power was declared *a serious consideration* as affecting the settlor's knowledge, and in Coutts *v.* Acworth, Law Rep. 8 Eq. 558, it was held that 'the party taking a benefit under a voluntary settlement or gift containing no power of revocation, has thrown upon him the burden of proving that there was *a distinct intention* on the part of the donor to make the gift irrevocable. And where the circumstances are such that the donor ought to be advised to retain a power of revocation, it is the duty of a solicitor to insist upon the insertion of such power, and the want of it will, in general, be fatal to the deed.' Mr. May, in his work on the law of Voluntary and Fraudulent Conveyances, edition 1872, page 452, dealing with the cases up to that time, says, 'The rule now is, that in cases where it would have been more prudent to insert a power of revocation, the absence of it will be a great mark of fraud, and that it is the duty of the solicitor who draws the deed almost to insist on the donor retaining the power of varying or revoking the gift, especially if it comprises a great part of the donor's property; and that a gift without such power cannot be upheld without very clear proof (and the *onus probandi* is on the donee) that the transaction was fully understood and was intended to be irrevocable. And where it appears that this was not the intention, the gift will be void from the mere want of such power, independently of any fiduciary relation between the parties.' In Hall *v.* Hall, Law Rep. 14 Eq. 365, the last English case, decided June 4th 1872, it is held as the established rule that 'where, in a voluntary settlement of real estate, a revocable deed would have answered the settlor's purpose as well as an irrevocable one, the absence of a power of revocation is primâ facie evidence of mistake, and that evidence can only be rebutted by showing that the settlor had his attention pointedly called to the fact that the instrument was irrevocable, and that he could have equally effected his purpose by a revocable one.'

"In Wollaston *v.* Tribe (*ut supra*), it was held that a 'person taking a benefit under a voluntary gift which is not subject to a power of revocation, has thrown upon him the burden of proving that the gift was meant by the donor to be irrevocable,' and 'that a voluntary gift not subject to a power of revocation, but not meant to be irrevocable, may be set aside by the donor.' The material facts in that case were substantially similar to those in the case in hand. The plaintiff, in contemplation of marriage, settled her property, 'first on herself for her separate use, without power of anticipation, then on her husband for life, then on the children of the marriage and those of any future marriage, and if she had no children, then on her nephews and nieces.' 'The settlement contained a power to appoint new trustees to the exercise of which no concurrence or consent of the plaintiff was required;' there was reserved to her neither a general testamen-

tary power, nor a power of revocation in the event of her surviving her husband and having no issue, or leaving no issue. The settlement was executed, and the marriage took place shortly afterwards, in 1858; there were no children of the marriage; the husband died in 1865, and in 1868 the plaintiff filed her bill, praying that certain trusts and provisions in the settlement (which she alleged were inserted ' without her knowledge and contrary to her intentions),' might be declared void, and for a reconveyance of her settled property. The evidence was, that the plaintiff told her brother-in-law that she wished her property settled on herself and then on her nephews and nieces; that her brother-in-law instructed a solicitor to prepare the settlement, who had an interview with the plaintiff; that, according to the plaintiff's account, she instructed him in general terms as to her wishes, but according to his account, the ultimate limitation to the nephews and nieces, as contained in the deed, was inserted by the plaintiff's ' explicit instructions;' that he offered to read the draft of the deed after it had been prepared, and again before it was executed, but the plaintiff refused, ' as she did not understand " law terms;" but ' he did not think that he explained to plaintiff the position in which she would be placed by the settlement in the event of her surviving her husband, and having no issue; and he was sure that he did not suggest to the plaintiff the propriety of inserting a power of revocation in that event;' and that the plaintiff denied that she ever received such explanation. The Master of the Rolls, Lord Romilly, in delivering his opinion, says, among other things, that the settlement, as to subsisting interests, is purely voluntary; that, of course, a voluntary gift is perfectly good if the person who makes it knows what it is, and intends to carry it into effect; but the plaintiff seemed not to have known or understood what she was doing; that, ' in the first place, the settlement is not in the usual form,' that ' according to the usual form,' the plaintiff ' would have had reserved to her a power of appointment in case she had no children; and then in default of appointment, the property would have been given to the nephews and nieces;' that ' it is quite clear in this case that she intended the nephews and nieces to take under the ultimate limitation; but it is by no means clear that she intended to deprive herself of all choice in the matter;' that he assumes that ' it was the plaintiff's own proposition to give it to the nephews and nieces, but it does not follow that it was to be an irrevocable gift; and it is quite certain from the solicitor's evidence, that he never told her that it was irrevocable,' * * * ' but that is just what he ought to have explained;' and ' that the settlement also is very defective in this respect, that it takes away completely all control by the plaintiff over the property;' that ' she cannot grant a lease; she cannot alter an investment; new trustees may be appointed without her concurrence; and as she says in one of

her letters, she is nothing but an annuitant on her own property,' and then on these grounds he declares ' the clauses of the settlement now in force are void as against her,' and directs ' a re-assignment of the property.'

"It is true, that in the subsequent case of Phillips *v.* Mullings (*ut supra*), Lord Hatherley expresses the opinion that it cannot be laid down, *as a general rule,* that a voluntary settlement would be voidable unless it contained a power of revocation, but he there held that there being no power reserved to the settlor to appoint in default of issue might have invalidated the· deed if it had not been shown that this was clearly explained to, and approved of, by him ; and then he goes on to affirm what is unquestionably a general rule, that in order to support such a settlement ' it must be shown that the nature of the deed was thoroughly understood by the person executing it. '    But in the still later case of Hall *v.* Hall (*ut supra*), Phillips *v.* Mullings was directly noticed, and the principle of the earlier cases, including Wollaston *v.* Tribe, was reaffirmed, and it is no part of the present argument that every voluntary settlement, to be valid, should contain a power of revocation.    There are cases in which it would not only not be prudent to insert such a power, but the insertion of it would invite, if not promote, what the settlement was intended to prevent, and of these, Phillips *v.* Mullings and our own case of Greenfield's Estate, 2 Harris 489, may be taken as examples.    In the former, the settlor was a young man of extravagant and improvident habits, and the very purpose of the settlement was to save the settled property from waste and secure for him the income from it for life; and in the latter, the settlor was a woman advanced in years, and she disposed of her estate by settlement rather than by will, to the very end that the disposition might be final and irrevocable, and that thus she might escape the annoyance, and protect herself against the importunities and impositions, of those who were supposed to be seeking to participate in her property ; and in both it was in evidence, that the deeds had been fully explained to the settlors.

"The argument here is only this : That in cases where the purpose of the settlement could be as effectively accomplished by a revocable as by an irrevocable deed, it must be clearly shown by the party who would uphold the deed, that it was meant by the settlor to be irrevocable and that the power of revocation was omitted intelligently and intentionally.    Now, in the present case, it is not only not shown that the only real purpose of the settlement could not have been thoroughly accomplished by a deed revocable in the event of her surviving her husband, but the contrary is sufficiently manifest.    There was nothing in the plaintiff's character, habits or surroundings, which made it prudent that her estate should be protected, or against which she sought to be protected ; so far as appears, she was then and is now as competent to deal with her

estate as any woman in the land.   She did not mean to secure her property against herself, but simply to put it beyond the reach of her husband's influence and control, and this is all it is established that she intended absolutely to do.

" Let it be admitted that she intended that her property should ultimately go to her sisters and brother, there is not a particle of proof outside of the deed itself, that she intended that it should so go in any event, and whether she survived her husband or not, or that she intended to 'deprive herself of all choice in the matter,' or that the gift should be irrevocable.   It is not pretended that she instructed her counsel to make the deed irrevocable, or that her attention was called to the fact that the deed was irrevocable, or that the deed was so explained to her that she could understand that it was irrevocable, or that she was advised that a revocable deed would answer her purpose as well as an irrevocable one in such a contingency as has happened; on the contrary, it is in evidence that from first to last there was a 'total silence' as to this very material, if not vital, matter.   There was a silence too, almost as total, as to a general testamentary power.   Her counsel testifies that 'if a suggestion had been made of a power of revocation or of a general testamentary power' after the death of the husband, 'he would freely have inserted it.'   This would seem to show that these powers were omitted from the deed, not because there was any objection to the insertion of them, or the plaintiff did not mean to reserve them, or the insertion of them would have defeated the real or any purpose of the settlement, but simply because the plaintiff, inexperienced in regard to settlements, did not suggest that something should be done as to the prudence of, or necessity for, which she was either innocently misled or wholly unadvised.   That the plaintiff did not intend that the deed should be irrevocable is sufficiently clear, and that she meant to reserve a general testamentary power may be fairly inferred from what occurred between herself and her intended husband and Mr. Russell, prior to the execution of the deed; and this inference is strongly corroborated by the fact that, after her husband's death, she attempted to exercise this very power.   In short, the plaintiff in executing the deed, does not appear to have fully understood what she was doing; the deed is not 'the well-understood act of her mind;' it does not fully express her intentions, and it has not been shown that 'its full import and effect were clearly and distinctly made known to her,' and therefore the deed, as it is, should not be allowed to stand.

" The fact that the plaintiff took part in the proceedings for the appointment of a trustee in the place of her husband after his death has not been overlooked.   It does not appear that she had any fuller knowledge or clearer understanding of the deed then, than when she executed it, or that in so participating she intended

[Russell's Appeal.]

to ratify it. In the argument it was not claimed for the defendants that by this act she had ratified the deed, nor upon any recognised grounds of law or equity could it be claimed that such an act, done as this act was done, would amount to a ratification.

" In all the cases cited, wherein relief was granted, the deeds were decreed not to be reformed, but to be cancelled or set aside, and reassignments or reconveyances were ordered, and this was done, as it would seem, upon the principle stated in Phillipson *v.* Kerry (*ut supra*), that if the transaction had been based upon a valuable consideration, ' then, possibly, the instrument might have been reformed or so modified and rectified, on proof of the intention of the parties, as to have carried those intentions into effect; but in a voluntary gift this is impossible. The instrument is either good or bad; it cannot be modified to suit former intentions, unless the donor consents to make a new and distinct instrument.'

" Properly, and upon principle, the deed in this case cannot well be reformed, but the master is very decidedly of the opinion that it should be set aside and a reassignment and a reconveyance ordered. The plaintiff does not specifically pray for this measure of relief; but the relief for which she does specifically pray can be effective, in the master's judgment, only through a reassignment and reconveyance, and this may be ordered under her prayer for general relief. The deed has accomplished the only purpose it was intended to subserve; its continuing operation is not a continuing security, but a continuing restraint; and it is from this unintended restraint that she now seeks relief. To this relief she is fairly and fully entitled; but it can be granted to her, not by reforming the deed, but only by decreeing a reassignment and reconveyance of the settled property, and then, if for any purpose she shall be minded to recommit her estate to the care and custody of trustees, she can execute a new settlement.

" It was stated in the argument, and is to be accepted as a conceded fact, that the trustees have dealt with the settled property, with the knowledge and consent of the plaintiff and under the powers in the deed; and it was suggested, rather than contended, that a decree setting aside the deed might cast a cloud upon their dealings. The master was at first inclined to concur in this view, but upon further reflection, it seems to him that a decree setting aside the deed and ordering a reassignment and reconveyance of the subjects of the trust as *now* held by the trustees, could scarcely have any retroactive effect or raise a doubt as to the validity of anything properly done by them. However this may be, the exigencies of the case do not imperatively require that the deed should be set aside, and its equity may be sufficiently satisfied by a decree simply ordering a reassignment and reconveyance."

The defendants filed the following exceptions:—

1. Because the master has reported that there ought to have

been inserted in the indenture of marriage settlement, mentioned in the pleadings in the cause, a power of revocation.

2. Because there is nothing in the evidence to show that at the time of the execution of the said indenture, it was not intended by all parties thereto to be an absolute and final disposition of her property.

3. Because the gift in remainder, in the said indenture, to the complainant's brother and sisters, or their issue, in default of appointment, was irrevocable, in the absence of evidence of fraud or imposition, and the master should so have reported.

4. Because the master has reported that the burden of proving that the absence of a power of revocation was intended, was on the respondents.

5. Because the master has reported that the exceptants should reconvey the subjects of the trust to the complainant.

6. Because the master has omitted to report that the complainant had ratified the indenture of settlement after her husband's death, by joining in proceedings for the appointment of a new trustee thereunder.

7. Because no decree can be made at the present time to bind the interests of persons *in futuro*.

The decree at Nisi Prius was as follows:—

And now, this twenty-seventh day of December 1872, this cause coming on to be heard on the exceptions to the master's report, and upon motion for a final decree: thereupon, upon consideration thereof, it is ordered, adjudged and decreed *pro forma*, that the defendants, Winfield S. Russell and Edwin T. Eisenbrey, trustees under the indenture of marriage settlement mentioned in the pleadings in this cause, do within twenty days from the date hereof, reassign and reconvey unto the plaintiff Emma Louisa Evans, her heirs, executors, administrators and assigns, the lands, tenements, hereditaments, property, effects and investments, forming the subjects of the trusts of the said indenture of settlement and now held, and as the same are now held by them, the said Winfield S. Russell and Edwin T. Eisenbrey, under and by virtue of the said indenture, and it is further ordered, adjudged and decreed, that the costs of suit and expenses of counsel be paid out of the capital of the trust estate.

The defendants appealed to the court in banc and assigned for error, that the court at Nisi Prius overruled their exceptions to the master's report, and entered a decree for the complainant.

*H. Wharton*, for appellants.—Conceding all that the complainant has testified to, she mistook the legal consequences of the settlement herself, without being misled by others: in such a case equity will not relieve: Story's Equity, § 116, &c. The sole basis of the master's report, as of the argument, is, then, the recent

[Russell's Appeal.]

English cases cited by the master, which he supposes establish it as a rule, that a solicitor, under certain circumstances, is bound to advise with his client on his or her desire to have a power of revocation inserted.

It would be equally fair to say, at least in this country, that an attorney ought not to insert a power of revocation, as that he ought not to omit one, without his principal's express directions. The rule, as stated by the master, has been greatly modified by the latest decision in England, Hall v. Hall, before the Lord Chancellor and Lord Justices, Law Rep. 8 Ch. Ap. 430, overruling the same case before the Vice-Chancellor Wickens, Law Rep. 14 Eq. 365, cited and relied on by the master. Lord Justice James, in this case, said:—" The law of this land permits any one to dispose of his property gratuitously, if he pleases, subject only to the special provisions as to subsequent purchasers and as to creditors. The law of this land permits any one to select his own attorney to advise him ; and it seems very difficult to understand how this court could acquire jurisdiction to prescribe any rule that a voluntary conveyance executed by a person of sound and disposing mind, free from any fraud or undue influence of any kind, and with sufficient knowledge of its purport and effect, should be void because the attorney of his own selection did not advise him to insert a power of revocation, or did not take his express direction as to the insertion or omission of such a power. It might, with as much reason, have prescribed that such a deed should be executed and so attested, as is required for a will, or that, like a married woman's deed, it should be acknowledged before a judge or commissioner. The true rule is that which was laid down by Lord Justice Turner in Toker v. Toker, 3 DeGex, Jones & Sm. 487, that the absence of a power of revocation is a circumstance to be taken into account, and is of more or less weight *according to the other circumstances of each case.*"

A voluntary deed, if executed knowingly and without fraud, cannot be set aside by the grantor, however harsh, unjust or absurd the result may be, owing to unforeseen circumstances : Kekewich v. Manning, 1 DeGex, M. & G. 176.

*W. H. Rawle*, for appellee, referred to and commented on Hall v. Hall, Law Rep. 14 Eq. 365; s. c. Law Rep. 8 Ch. Ap. 430 ; Henshall v. Fereday, 27 Law Times Rep. 743. The equity powers of the courts in Pennsylvania extend to the reformation of deeds, &c. : Huss v. Morris, 13 P. F. Smith 367.

The opinion of the court was delivered, April 2d 1874, by

AGNEW, C. J.—The full and able discussion of this case by the master, and the authorities he cites, relieve us from any elaborate opinion upon the question in controversy. From the facts found, it

25 P. F. SMITH—19

is evident Mrs. Evans, then Miss Fotterall, had no motive to fulfil in executing the marriage settlement with William Elbert Evans, except to provide for the control and disposition of her property during their joint lives and Mr. Evans's survivorship, and to regulate its succession after *his* death. A provision for her own survivorship, and especially without issue by him, seems not to have been in her own thought, and was not presented to her mind by her counsel or any one else. The nearest approach towards the subject was, when, after reading the deed of settlement alone, and unaided by the suggestion of counsel, the question arose in her mind, whether she could dispose of her property by will as she pleased, and on inquiring of Mr. Russell, her intended trustee, whether she could, he answered "yes." When her mind was thus nearing the important question of her personal control, it was led away from its pursuit by an answer that set inquiry at rest. Thus she executed the settlement without the usual and all important clause of revocation, or even a power to will or appoint the uses, in the event of her survival, and after the settlement had performed the entire purpose which called it into existence. It does not appear that she had any reason or motive, either for disabling herself, or for benefiting her brother and sisters, by tying up her hands in case she survived her intended husband. The provision for them was evidently to furnish a channel of descent only, for her property, when she, and her husband after her, needed it no longer, and she should have no issue to take it. The conclusion of the master is, in which we fully concur, that these collateral depositaries of her estate were mere volunteers in the fullest sense of the term. There was not a spark of consideration, and not a motive to provide for them, further than to specify persons into whose lap the estate should fall, after her husband's death surviving her.

The single question, then, is, whether equity will not set aside an act, which thus strips an owner of property, and vests it in others without motive or reason, against the interests and desire of one who has ignorantly and without intention done this unwise and evidently mistaken thing. To support the settlement in favor of such mere volunteers, would be to convert a merely accidental formality, into an act of substance and will, and to override justice, intention, and the welfare of the true owner. That the law of the land permits any one to dispose of his property gratuitously, if he please, when not prejudicial to the interests of creditors, and that his voluntary gifts, made with full intention and knowledge of the act, are irrevocable in equity as well as in law, when the power to revoke is not reserved, may be conceded. It may be admitted, also, that the mere omission of counsel to advise the insertion of a power to revoke, will not, alone, be a ground in equity to set aside a voluntary conveyance. But the absence of such a power, and the failure of counsel to advise upon it, are circum-

stances of weight when joined to other circumstances tending to show that the act was not done with a deliberate will. Therefore, when the facts show that the instrument was executed without advice or reflection, and without an intention to bind the party after the reasons and motives for executing it have passed away, and the party is again.*sui juris*, a court of equity will and ought to relieve as against mere volunteers, claiming without consideration or a reasonable motive for continuing the donor's disability. There may be reasons for continuing the disability, intended by the grantor or settlor, which would influence the chancellor to maintain it; as where a settlement is made for self-protection against improvidence, or the urgent importunities of others, which the circumstances show it is difficult for the grantor or settlor to resist. But in such exceptional cases the deliberate intention of the party to tie up his own hands should clearly appear.

The cases cited by the master show very distinctly that the actual intent of the donor is necessary; and in the absence of a certain intent to make the gifts irrevocable, the omission of a power to revoke is primâ facie evidence of a mistake, and casts the burthen of supporting the settlement upon him who, without consideration or a motive to benefit him or protect the donor, claims a mere gratuity against one who is *sui juris*, and capable of taking care of his own estate.

This mistake is not one simply of law. That would be so if the settlor, in full view of all the clauses and provisions in the deed, would interpret them for himself as being in law adequate to confer a power of revocation upon him, when in truth the law would not so expound the instrument. But in a case such as this the mistake is one of fact, so mixed with the legal effect of the writing, equity will use the mistake of fact as a means of relief. The mistake here was in not perceiving and being conscious that a case was left unprovided for which might happen, and in which event the settlor, Miss Fotterall, would desire to make a provision agreeably to her wishes and will. The settlement provided for the marriage and the survivorship of her intended husband, with and without issue by her, and for the results of these contingencies; but it failed to provide for the case of Mr. Evans dying first without issue by her. This was a state of fact not presented to her mind, and therefore she did not see that the legal operation of the deed upon the happening of this contingency became different from what she would have provided had the fact occurred to her. It was therefore not a mistake merely of the legal operation of the instrument, but a mistake flowing from the want of conception, or a misconception of facts, which might occur and were not provided for. There was a complication of contingencies presented to an unpractised mind, unaided by the counsel of her legal adviser, in the very particular in which her mind ought to have been in-

structed, involving the occurrence of future facts, to which her attention ought to have been directed. The effect evidently was that her mind gave no assent to the legal operation of the instrument upon the happening of the unforeseen contingency. It is therefore precisely the case where equitable relief comes in as against mere volunteers, for whom no provision was intended in that contingency. The master fully appreciated this principle, and has cited abundant English authorities to sustain it. There are at least two Pennsylvania cases which maintain this principle of equitable relief. It is fully discussed, and American authorities cited to sustain it, in Gross *v.* Leber, 11 Wright 520, where obligors in a bond gave it under a mistake of their position and duties. The other case is Whelen's Appeal, 20 P. F. Smith 410. The opinion of Judge Allison, adopted by this court, discusses at length the title of a party to equitable relief in the case of a mixed mistake of law and fact: p. 425, *et seq.* Huss *v.* Morris, 13 P. F. Smith 367, is not on this point, but has a slight bearing upon it.

In the case now before us, the legal adviser of Miss Fotterall was a gentleman at the head of his profession, whose attention had been given largely to the law of real estate and conveyancing. He testified that he did not remember any reference whatever being made to the fact of Miss Fotterall's surviving Mr. Evans, or what would be done in that event; and he had no recollection as to any instructions as to a power of revocation being inserted in the instrument. In his own expressive language upon cross-examination, "there was a total silence on this subject." Silence, in such a case, where an inexperienced young lady is called upon to act in a matter of so much importance in the future, is more expressive than words, and it derives still greater significance from another fact stated by the witness. He says, "I have had a very large experience in drawing wills and marriage settlements, and I have always had *a great aversion* to the wife having a power of revocation, or a general testamentary power during the life of the husband, to subject her to the solicitations of her husband. *I have a dislike to seeing property go out of a family.*" Now, though he adds, this does not apply to cases where the marriage has ended by the death of the husband, his strong aversion and dislike probably had something to do in closing his mind against a reference to the subject of revocation in any aspect; while, Mr. Evans then being in full life, the thoughts of the counsel were not led to reflect upon the contingency of Miss Fotterall's surviving him. A mind, having less repugnance to the power of revocation, might probably have been more open to think of all possible contingencies, and to provide for that very one which has actually happened, and which, in this case, was thus incautiously omitted.

I have not had access to Law Rep. 8 Ch. Ap. 430, containing the case of Hall *v.* Hall, decided in 1872, but from the statement

[Russell's Appeal.]

of the facts contained in a former report of the case, in Law Rep. 14 Eq. 365, and the extracts contained in the argument of the appellant, I am satisfied it does not impinge upon the principle of equitable relief to be applied in this case. "The true rule (says the citation of the appellant) is that which was laid down by Lord Justice Turner, in Toker *v.* Toker, 3 De Gex, Jones & Sm. 487, that the absence of a power of revocation is a circumstance to be taken into account, and is of more or less weight, according to the other circumstances of each case." Adopting this rule of action in the present instance, and we see that all the circumstances make the absence of the revocation clause in this settlement strong evidence of mistake, and a sufficient ground of equitable relief. So the circumstances in Kekewich *v.* Manning, 1 De Gex, MacN. & Gord. 176, bear no real resemblance to those in this case, and therefore that case cannot possibly be considered as ruling this. The same remark may be made of the case of Toker *v.* Toker, *supra*, while its principle sustains our decision in this case. There are other English cases more like this, in which the result of the equitable doctrine was the same we have arrived at in this case; for example, Wollaston *v.* Tribe, Law Rep. 9 Eq. 44, and Phillipson *v.* Kerry, 32 Beavan 628. Others might be added.

The decree of the Nisi Prius is affirmed with costs and the appeal is dismissed.