Scott's Trust.

(1)

2

Argued December 5, 1935.   Before FRAZER, C. J., SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

*Thomas Ridgway,* for appellants (No. 337).

*Charles I. Thompson,* with him *Frederick H. Knight* and *Bevan A. Pennypacker,* for appellant (No. 356).

*Morris Duane,* of *Duane, Morris & Heckscher,* for appellants (No. 361).

*Paul Freeman,* with him *William Logan Fox* and *Warwick Potter Scott,* for appellants (Nos. 343, 362 and 366-370, inclusive).

*Philip Wallis,* with him *Drinker, Biddle & Reath,* for appellee (Trustee).

*Warwick Potter Scott,* with him *Paul Freeman* and *William Logan Fox,* of *Freeman, Fox & Steeble,* for appellees (Distributees).

OPINION BY MR. JUSTICE BARNES, April 6, 1936:

These appeals are taken from a decree of the court below dismissing exceptions to the adjudication upon the account of the Fidelity-Philadelphia Trust Company, as trustee under deed of trust of Thomas A. Scott, and awarding distribution of the principal held by the trustee.

On March 15, 1880, Thomas A. Scott, referred to as the settlor, executed a revocable deed of trust to the Fidelity Insurance, Trust and Safe Deposit Company, now the Fidelity-Philadelphia Trust Company, as the trustee named therein, and delivered to the trustee, to compose the corpus of said trust, certain securities having a face value of $834,500. Under the deed, the entire income from the trust was payable to his wife, Anna Dyke Scott, for life. Immediately upon her death he directed his trustee "to set apart from the corpus of said trust estate, securities of the face value of $100,000." This smaller trust estate so carved out of the original

4

one, is known as the "Riddle trust." It is this Riddle trust for which accounting is now made, and which affords the subject of these appeals.*

The provision of the deed creating this trust and disposing of the income and principal thereof, is as follows: "And immediately after the decease of my said wife, Anna Dyke Scott, to set apart from the corpus of the said Trust Estate securities of the face value of One hundred thousand dollars, and to hold the same, paying the income thereof as and when the same is received into the hands of the mother of my said wife, Mary I. Riddle, and after her death to divide, share and share alike, the income of the said securities thus set apart amongst the children of her the said Mary I. Riddle, namely, John S. Riddle, Betsy Fisher, the wife of George Harrison Fisher, and Robert M. Riddle, or their descendants upon the principle of representation should any of said children be then dead, and to pay the income thereof to the said children for the maintenance and support of them-

---

* (a) Thomas A. Scott, the settlor, died May 21, 1881,—fourteen months after creating this trust.

(b) Mary I. Riddle, mother-in-law of settlor, died December 20, 1890. Her daughter, Anna Dyke Scott, was the wife of settlor. She was survived by her daughter, Anna Dyke (Riddle) Scott and her three remaining children, John S. Riddle, Betsy Fisher and Robert M. Riddle, who were the Riddle children named in the deed of trust.

(c) Anna Dyke Scott, wife of settlor, died February 21, 1901.

(1) John S. Riddle died July 22, 1906, leaving two children, Hugh H. Riddle and Bettina Von Hutten, and no other descendants.

(2) Betsy Fisher died September 16, 1932, leaving Anna Scott Hart as her sole surviving child, and no other descendants.

(3) Robert M. Riddle died January 18, 1933, leaving no descendants. He is survived by his wife, Lena S. Riddle.

(d) Thomas A. Scott, the settlor, and Anna Dyke Scott, his wife, were survived by four children: Mary Scott Newbold, Miriam D. Thropp, Edgar T. Scott and James P. Scott. These four children are now deceased, leaving children who are the grandchildren of settlor.

selves and their families, or to the guardian or guardians of any descendants of said children, for their maintenance and education, and upon each of such descendants of said children attaining the age of twenty-one years, then and in that event to pay over, assign and transfer to each their respective shares absolutely. But if such children should all die without issue, and if such descendants should all die without issue before attaining the age of twenty-one years, then and in that event the securities thus set apart are to revert to and form a part of the said Trust Estate."

The settlor's mother-in-law, Mary I. Riddle, died December 20, 1890, and his wife, Anna Dyke Scott, died February 21, 1901. Anna Dyke Scott was survived by her sister and two brothers, John S. Riddle, Betsy Fisher and Robert M. Riddle—the Riddle children mentioned in the deed of trust.

Upon the death of the wife of settlor, in 1901, the trustee set apart from the corpus of the original trust securities of the face value of $100,000 to constitute the principal of the Riddle trust, as directed by the deed. It selected, with the consent of the three Riddle children, one hundred 5% mortgage bonds of the Texas and Pacific Railway Company, due in the year 2000. The income from these bonds was thereafter paid in equal shares to John S. Riddle, Betsy Fisher and Robert M. Riddle, until the death of John S. Riddle, on July 22, 1906.

John S. Riddle was survived by two children, Hugh H. Riddle and Bettina Von Hutten, and there was no issue of any deceased child. As his children had attained the age of twenty-one years, the trustee distributed to them in equal shares thirty-three of the Texas and Pacific bonds representing one-third of the then corpus of the Riddle trust. One bond was sold to provide for the payment of administrative expenses. Thereafter, the trustee continued to hold the remaining sixty-six bonds, and to pay the income therefrom to Betsy Fisher and

6

Robert M. Riddle, the two remaining Riddle children, until their respective deaths. Betsy Fisher died September 16, 1932, leaving Anna Scott Hart as her sole surviving child, while Robert M. Riddle died on January 18, 1933, leaving no issue. There was no distribution of the principal made following the death of Betsy Fisher.

The present account, filed November 6, 1933, is the first accounting made by the trustee of its administration of the Riddle trust. In the account the trustee shows that during the years 1926, 1927 and 1928, it made sale of the remaining $66,000 of Texas and Pacific Railway Bonds and invested the proceeds in mortgages and other securities, which it now has on hand for distribution. It takes credit for and asks approval of the distribution of one-third of the principal made in 1906 to the two children of John S. Riddle.

There were two principal questions raised in the court below: First, whether the sale of the Texas and Pacific Railway Bonds in 1926-1928 was proper, or was the trustee bound to hold them for distribution in kind to the persons thereunto entitled. Second, under the terms of the deed of trust, to whom should distribution be made of the corpus of the trust fund.

The auditing judge held that it was the duty of the trustee to sell the bonds and invest the proceeds in securities legal for trust funds. He approved the distribution of principal made in 1906 to the two children of John S. Riddle and awarded the corpus then remaining to the descendants of the Riddle children in the proportion of three-fourths to Anna Scott Hart (sole child of Betsy Fisher) and one-fourth to Hugh H. Riddle and Bettina von Hutten, children of John S. Riddle.

Exceptions to the adjudication and decree of distribution were dismissed by the court en banc, and these appeals followed.

On the part of some of the appellants it is earnestly contended that they should not be required to accept the mortgages on real estate and other securities now con-

stituting the corpus of the trust estate, but that they are entitled to receive the bonds of the Texas and Pacific Railway Company, or their equivalent in cash at the present market value, for the reason that the trustee was required to "hold" the securities which the settlor placed in trust. They point to the provision of the indenture reading: "And immediately after the decease of my said wife, Anna Dyke Scott, to set apart from the corpus of said trust estate, securities of the face value of $100,000, and *to hold the same,* pay the income thereof, etc." It is asserted that the trust deed contained no power of sale to the trustee and in consequence the sales made of these bonds in 1926-1928 were unauthorized. It appears that the estate would be in larger amount had these bonds been retained, owing to the depreciation of the investments made by the trustee of the proceeds resulting from the sales.

Among the original securities delivered by the settlor to the trustee were included three hundred Eastern Division Consolidated Mortgage 6% Bonds of the Texas and Pacific Railway Company, due June 1, 1905. These bonds had a face value of $300,000. In 1884 the Texas and Pacific Railway Company encountered financial difficulties, and was unable to meet the interest charges upon these bonds. After a period of four years a plan of reorganization was finally effected, which involved an exchange of securities. The trustee became a party to the reorganization agreement in 1887, surrendered the bonds mentioned, with unpaid coupons maturing during the four-year period, and received during the year 1888 in exchange therefor Texas and Pacific Railway Company First Mortgage 5% Bonds in the amount of $346,050, due June 1st, in the year 2000. Bonds of the face value of $300,000 were retained as part of the principal of the trust, and the remaining bonds were delivered to the life tenant, Anna Dyke Scott, as accrued income. It will be noted that this exchange of bonds occurred prior to the actual segregation in 1901 of the

securities to constitute the corpus of the Riddle trust,
when one hundred of the bonds so received in exchange
were selected for that purpose. As stated, a portion of
these bonds was distributed in 1906 to the children of
John S. Riddle, the remaining bonds being held in the
trust.

In 1925 the trustee was consulted as to the advisability
of selling all or a part of these bonds. At first it was
doubtful whether it had the power of sale under the
deed, but thereafter concluded that as the bonds in ques-
tion were not securities originally delivered to it by the
settlor, but were bonds exchanged for the original bonds,
it was not only empowered to sell, but it was its duty to
sell them and invest their proceeds in legal securities.
This decision was based upon the following provision of
the trust indenture: "And if any of the bonds hereby
assigned or any other investment hereinafter constitut-
ing the said trust estate shall become due or be paid off,
then the said trustee shall invest and keep invested the
money received by reason thereof in such securities as
the laws of the State of Pennsylvania now do or here-
after shall sanction as proper for the investment of trust
funds." The trustee adopted the view that the railway
company, by virtue of the reorganization, had in effect
called in or paid off the original bonds by the issue of a
new and different security. Accordingly, the trustee
sold at a premium all of the $66,000 of bonds in 1926-
1928 then held in the trust, and the proceeds were in-
vested in legal investments, principally in first mort-
gages upon real estate.

It is fairly conceded by appellants that the exchange
bonds were not identical with those originally delivered
to the trustee by the settlor. Briefly, the original con-
solidated mortgage bonds were due June 1, 1905; the
new ones June 1st, in the year 2000. The original bonds
bore interest at 6%, the new bonds at 5%. The original
bonds were secured by a lien on 524 miles of track, and
were subject to prior liens; the new bonds were secured

upon the same 524 miles of track and also upon an additional 963 miles of track and other property. The original bonds were part of an issue of $9,316,000, the new ones were part of an issue of $21,049,000. The original bonds enjoyed the benefit of a sinking fund, the new ones had no such provision. The new bonds not only replaced the original ones, but also several other bond issues on the track and property of the railway. The trustees under the original mortgage were two individuals, while the trustee under the new mortgage was the Fidelity Insurance, Trust and Safe Deposit Company, now the Fidelity-Philadelphia Trust Company. In only two respects were the bonds the same: they had the same obligor and a part of the mortgaged property was the same. In all other respects they differed, namely, in the identity of the trustee, the interest rate, the maturity, the presence or absence of a sinking fund, the remedies, and the total amount outstanding. While it is true that the exchange bonds are obligations of the same company, yet there are such admitted differences between the two issues that they cannot be regarded as the same security.

Appellants go further and assert that the trustee, after making the exchange, could have elected in 1888 to dispose of the new bonds as salvage, or to consider them as the equivalent of the original bonds, and to hold them, but having retained them, and having stood upon that decision for nearly forty years, it could not in 1926-1928 arbitrarily sell the bonds without notice to and consent of the beneficiaries. Furthermore, they say that since these bonds were selected in 1901 to compose the corpus of the Riddle trust, the trustee was compelled thereafter to retain them in the trust for final distribution to the beneficiaries, unless in the meantime the bonds were redeemed by the railway company.

We have given most careful consideration to the question involved in the sale of these bonds and cannot escape the conclusion that the exchange bonds were mate-

10

rially different from the original ones. This being true, it was the duty of the trustee to sell. It may be, as stated by the court below, that the trustee was chargeable with a very serious oversight in holding these bonds for so many years, and had they depreciated a claim for surcharge might well have arisen. But this question is saved because the bonds increased in value and were sold at a substantial profit. Because the trustee permitted many years to elapse before making sale does not preclude its eventual performance of the duty imposed by the trust.

As counsel has stated, it has not been possible to find any authorities bearing directly upon the present issue. Recently, we had before us a case, *Macfarlane's Est.,* 317 Pa. 377, where a competent beneficiary, with full knowledge of the facts and of her rights, gave consent amounting to affirmance of the retention by the trustee of shares of stock received in exchange for original ones owned by the estate. We refused to surcharge the trustee for retaining the shares. Speaking by Mr. Justice DREW we said (page 381) : "At the outset it may be noted that the shares of the new corporation might well be found to be so substantially equivalent to those of the old that the trustee's retention of them was within its testamentary authority to hold the shares left by the testator, and therefore entirely proper. . . . If a trustee holds shares of a corporation which he can properly retain, and the corporation is merged or reorganized into a new corporation, the trustee can properly receive and retain new shares in exchange for the old where they are substantially equivalent to the old shares and it is not imprudent for him to do so: *In re Smith,* (1902), 2 Ch. 667; *Anderson v. Bean,* 272 Mass. 432; see *Restatement, Trusts,* section 231, comment f."

In the case before us it cannot be held that bonds maturing ninety-five years after the original ones, bearing a lower rate of interest, forming part of a much greater issue, and secured upon more property of the same

debtor corporation, are substantially equivalent to the old ones. See *Horn's Est.*, 317 Pa. 49. In *Mertz v. Guaranty Trust Co.*, 247 N. Y. 147, a trustee under a consolidation received shares of preferred and common stock in exchange for shares of common stock held under a deed of trust. The trustee sold the new stock although he had no power of sale in the deed. The Court of Appeals of New York refused to surcharge the trustee. In an opinion by the then Chief Judge, Mr. Justice CARDOZO, after an interesting discussion of the subject of substituting securities, the court said: "A trustee finds upon his hands an investment, mandatory in its origin, but so changed as to be no longer mandatory, even if permitted. A power of sale attaches in such circumstances by implication of law." To the same effect is *Harriman's Est.*, 254 N. Y. Sup. 158.

Here the settlor plainly directed that the principal of the trust estate should be composed of the securities originally delivered by him to the trustee, or of securities legal for trust investments. The provision in the deed with respect to investments did not contemplate that the Riddle trust was to consist of whatever securities were allocated to it by the trustee in 1901, when the smaller trust was set apart. In the view which we have taken of the exchange bonds received in 1888, no act of their selection in 1901 to compose the smaller trust could transform them conclusively into investments such as was required by the trust deed. The deed spoke as of the year of its creation, not the date when the transfer of securities from one trust to the other was made, and the parties, trustee or beneficiaries, were without power to change this provision of the trust.

Turning now to the second question involved in these appeals, it becomes necessary to determine the proper method of distribution of the corpus of the Riddle trust. The income of the fund was paid according to the clearly expressed directions of the settlor, but now that the last income beneficiary has died, the interpretation of that

12

portion of the deed of trust making ultimate disposition of the fund is a subject of controversy. The court below held that a gift in remainder, whether express or to be implied, was made to "the descendants of Mary I. Riddle's said three children" upon the termination of the life estates of John S., Betsy (Fisher) and Robert M. Riddle. It therefore awarded the corpus of the trust to their children, Anna Scott Hart, Hugh H. Riddle, and Bettina von Hutten, in the proportions consistent with the principle of representation.

These appeals contend for a distribution of the corpus different from that made by the court below, and different from each other. There are four conflicting interpretations of the provision in question: (1) that the corpus should be distributed to the Riddle descendants as decreed by the court below; (2) that the entire corpus of the Riddle trust (including the one-third portion thereof distributed in 1906, for which a surcharge is claimed) was not disposed of by the deed and should be awarded to the heirs of the settlor; (3) that the $33,000 portion of the corpus upon which Robert M. Riddle (who was not survived by issue) received income during his lifetime was not disposed of by the deed and should be awarded to the heirs of the settlor; (4) that the $33,000 portion of the corpus upon which Robert M. Riddle received income during his life, should be awarded to the executor of his estate for distribution in accordance with his will. These various constructions were ably and forcibly presented for our consideration, and we have reviewed each one with care. We shall confine this opinion, however, to the view which we take of the disputed provision. Our conclusion is based primarily upon the manifest intention of the settlor as gathered from a consideration of the entire instrument.

Did the settlor intend to make an absolute gift of the corpus of the trust to the Riddle descendants?

As we view the language of the instrument creating it,

the reversionary clause of the Riddle trust gives a complete answer to this question. The settlor there provides: "But if such children should *all* die without issue, and if such descendants should *all* die without issue or attaining the age of twenty-one years, then and in that event the securities thus set apart are to revert to and form a part of the said Trust Estate." (The Trust Estate last mentioned is the original or larger trust out of which the Riddle trust was carved.) It seems to us this conclusively demonstrates that the settlor intended his own heirs should never inherit any portion of the Riddle trust unless the Riddle children—his two brothers-in-law and his sister-in-law—were all deceased and left no descendants who attained the age required. This clear and unequivocal expression by the settlor of the one condition upon which a reversion should take place necessarily operates to exclude every other contingency under which it might be asserted that settlor's own descendants should share in the fund. Admittedly, two of Mary I. Riddle's three named children were survived by descendants who reached their majority, so that the condition upon which a reversion was to take place did not occur. It therefore follows that when the reverter was defeated, the corpus of the trust vested in the Riddle descendants absolutely, to the complete exclusion of the heirs of the settlor.

That this was the intention of the settlor appears even more clearly when the reversionary clause is read in connection with the clause immediately preceding it, where the settlor provided that "upon each of such descendants of said children attaining the age of twenty-one years, then and in that event to pay over, assign and transfer to each their respective shares absolutely." The expression "pay over, assign and transfer" clearly indicates that the shares to be paid over at that time were shares of principal, consisting of securities which would have to be assigned and transferred, and not shares of income, as to which such words would have no application. This

construction is strengthened by the use of the word "absolutely," which has little meaning unless it refers to principal as distinguished from income. These terms indicate that the settlor intended a complete vesting of the title to the securities as opposed to a conditional one, and that he realized some act of assignment or transfer would be necessary in order to place absolute ownership in the persons whom he wished to be the objects of his bounty. He therefore gave express instructions to this effect. The construction urged upon us that the term "absolutely" refers only to the manner in which income was to be paid to the Riddle descendants upon their reaching majority, in the sense that it was then to be free from the intervention of a guardian or guardians, is a forced interpretation and one with which we cannot agree.

When the facts concerning the settlor's entire estate are considered, this provision for his wife's mother and family was a natural and reasonable one for him to make. We are informed by a stipulation on the record, approved by all the parties in interest, that the settlor left a net estate available for distribution of "not less than ten million dollars." Under his will and the codicils thereto, $9,700,000 was left to his wife and his own descendants. By various trusts created by him, he made ample provision for his collateral relatives. Out of this large estate, the settlor set apart one per cent for the benefit of his wife's mother and her family. He expressly stated in the very beginning of the trust deed that it was made "in consideration of the natural love and affection" that he bore for his wife; it is not unnatural to infer that his love and affection for her included also a certain solicitude for the welfare of her family.

For these reasons it is clear to us that it was the intention of the settlor to create a trust fund for the benefit of the Riddle family in which his own descendants would have no interest except upon the one expressed contingency (which has not materialized) that all of the

descendants of the named Riddle children should die before reaching full age.

It is equally clear that the settlor intended that no part of the principal of the Riddle trust should be paid to the three children of Mary I. Riddle expressly named in the deed as income beneficiaries. By providing merely that they should receive income of the trust fund, the deed of trust impliedly negatives any intention that they should ever receive any part of the principal. Moreover, the direction that the principal should be distributed when the descendants of the three named beneficiaries attained the age of twenty-one years clearly rebuts an intention that the named beneficiaries should receive the corpus during their lives; the plain and natural meaning of this provision of the deed is that the "respective shares" which are to be assigned and transferred absolutely are to be paid *to the descendants,* not to their parents. As we read the language of the deed of trust, the intention in the mind of the settlor in creating it was to assure to the named brothers and sister of his wife an income during their respective lives, and to give the principal of the fund to such of their descendants as should reach full age. In this light, the provision that the corpus of the trust should be paid to the descendants absolutely, makes, with the reversionary clause, a complete, orderly and well defined scheme for the distribution of the Riddle trust.

In our opinion the portion of the deed of trust in dispute reveals the following plan on the part of the settlor for the payment of income and the ultimate distribution of principal: the income from the entire original trust was to be paid to his wife for life; upon her death the Riddle trust was to be created, the income of which was to be paid to Mary I. Riddle, during her life; after her death the income was to be divided and paid to such of Mary I. Riddle's three named children as should be living whenever such distribution of income was made, and to the then living descendants by representation, of such

children as might be deceased; and when any descendant attained the age of twenty-one years, such descendant was to receive absolutely his share of the corpus. In this view which we take of the meaning of these provisions, the intention is sufficiently clear that resort to technical canons of construction is unnecessary. As Mr. Justice SIMPSON very clearly said in *Shaffer's Est.*, 262 Pa. 15, 19 : "A testator's intent must always be carried into effect unless inconsistent with established rules of law, and will not be defeated by any technical rule of construction. In the present instance, the intent being ascertained, there is no rule of law or construction standing in the way of carrying it into effect, unless we propose to wholly defeat it, and we have neither the right nor purpose so to do."

It was truly said more than two hundred years ago, that "no will has a brother," quoted in *Williamson's Est.*, 302 Pa. 462. This observation applies with equal force to deeds of trust. As Mr. Justice MAXEY said in the case referred to (page 466) : "This will must be construed by itself on its own unusual phrasing. Each will is its own best interpreter, and a construction of one is no certain guide to the meaning of another." The unusual phrasing of the present deed of trust makes it "its own best interpreter." Where the meaning of a trust deed stands out with clearness, as in the present case, the application of technical rules is unnecessary. Whether the result is reached by implying a cross limitation over to the Riddle descendants, or whether the words "or" and "then" have any particular technical meaning, as has been urged upon us, disappears from the case in the light of the fundamental rule that the guiding principle is the expressed intention of the creator of the trust.

All assignments of error are overruled. The decree of the court below is affirmed. The appellants in the ten appeals shall pay the respective costs.