Cope's Estate. No. 1

*Henry D. O'Connor,* for beneficiaries, exceptants.

*J. Barry Colahan* and *Townsend, Elliott & Munson,* for accountant, exceptant.

*Louis Spivak,* guardian and trustee ad litem, p.p.

HUNTER, J., April 14, 1944.—Exceptions have been filed by the trustee and as well by the beneficiaries, and a variety of questions are raised which will be disposed of seriatim.

### Re Premises 5512 Woodland Avenue

The auditing judge found that the trustee was guilty of supine negligence in "summarily and tersely" declining an offer of $4,500 for this property, from an intending purchaser, and in not stirring itself under the circumstances to dispose of the property. The trustee excepts to the surcharge of $3,000 which is the difference between the price at which the property could have been sold, $4,500, and the price for which it was actually sold, $1,500.

It is unfortunate that the trustee did not accept the offer of $4,500 in 1930, because the property remained vacant and unproductive until September 1938, and was sold to the tenant in January 1939 for $1,500.

The property had been appraised at $9,500 in 1924 when the mortgage investment of $5,500 was made, and there was a $2,500 second mortgage held by a building and loan association. Default in interest occurred in 1928, at which time taxes were paid in full, and title was taken by the trustee by foreclosure of mortgage in 1929.

The trustee was confronted with a difficult problem.

On the one hand, an appraisement in 1928 showed a value of $7,000, and Wallace S. Martindale, the company's real estate officer (now deceased), considered that the property was still worth $7,000 in 1930. The property was then assessed for taxation at $7,000,

which was an increase over an assessment of $6,500 in 1924, and at the time the $4,500 offer was made a prospective tenant was offering $50 a month for the property if reconditioned.

On the other hand, there was the extreme dilapidation of the property, which was an old residence with a store front. The neighborhood was "dead", with many modern and more desirable properties awaiting tenants. The company's appraiser who valued the property at $7,000 in 1928 reported that no one would be interested in buying the property in its condition of disrepair, and if put in fit condition he doubted that the cost could be gotten out of it. Furthermore, there was no money in the trust, principal or income, out of which these repairs could be made.

Notwithstanding these adverse circumstances, we are of the opinion that the trustee had the right and duty to exercise its judgment whether a sale should be made at the price mentioned. We now know in retrospection that a mistake was made, but trustees are not accountable for that which they could not have foreseen. When a trustee acts with common prudence, common skill, and common caution, all that is required of him is the honest exercise of judgment based upon a consideration of existing conditions. A surcharge will not be imposed for a mere error of judgment: Miller's Estate, 345 Pa. 91.

Nor can we convict the trustee of supine negligence in not more actively soliciting a higher offer from the intending purchaser. In its letter rejecting the offer the trustee wrote: "If you're interested in submitting a revised proposal we will be glad to give it consideration." Nothing further was heard from the purchaser, and there is no indication that a higher offer, commensurate with the trustee's idea of the value, could have been obtained from him.

Suppose the property had been sold for $4,500, how could the trustee have met the reproach of the parties

that it had been sold for a price far below the valuation which the trustee had put upon it?

The exception of the trustee is sustained.

### Re Stock of Land Title Bank & Trust Company

By adjudication filed in 1898, 16 shares of Land Title & Trust Company stock, which had been owned by decedent, were awarded to the trustee at the then value of $150 per share. This stock was retained by the trustee, and in 1927 had increased in value to almost $1,200 a share. In 1928 the company merged with the Real Estate Title & Trust Company and the West End Trust Company, and the trustee exchanged the old stock for new stock under the terms of the merger. Subsequently the stock lost its value in the market crash of 1929 and in the closing of banks in 1932 and 1933, and was finally sold for an amount less than the original value of the award to the trustee.

The beneficiaries contend that the trustee should be surcharged with the value of the stock at $1,200 per share.

The investment clause of the will is as follows:

"Power to change the investments of the personal estate from time to time and to make investments in any interest-paying securities they may deem good and sufficient, without being restricted or limited to such investments only as are now or may be hereafter authorized by law."

The beneficiaries concede that the trustee had power to retain decedent's stock under the investment clause of the will, but was not authorized to accept new stock in the merged corporation. We agree with the auditing judge that the parties, when they conceded that the original stock could be retained, practically conceded themselves out of court.

No distinction under the terms of the will can be made between the right of the trustee to retain decedent's stock and the right to acquire other stock of the

same type: Macfarlane's Estate, 317 Pa. 377; Scott's Trust, 322 Pa. 1. See also McGraw's Estate, 337 Pa. 93, Stirling's Estate, 342 Pa. 497, and Greenawalt's Estate, 343 Pa. 413, where a liberal construction was given to the investment powers of a trustee.

The exceptions of the beneficiaries are dismissed.

*Re Premises Germantown Avenue and Rex Street*

The beneficiaries except to the direction of the adjudication that the proceeds of this property be apportioned in accordance with the formula of Nirdlinger's Estate (No. 2), 327 Pa. 171.

The court is evenly divided on the subject of this exception, and the opinion as here written expresses the views of Van Dusen, P. J., Bolger, and Hunter, JJ., who would sustain the exception.

The property had been decedent's residence and was sold subject to a purchase-money mortgage. The mortgage, reduced to $35,000, was foreclosed in April of 1919 and the property was resold in October of the same year for $40,000, resulting in a profit to the estate.

Income account includes rent for six months after the foreclosure, less certain adjustments with purchaser, and in addition the account shows that the trustee transferred from principal to income the sum of $1,475.70 to make up "delinquent mortgage interest" due the life tenant. The guardian and trustee ad litem representing the remaindermen objected before the auditing judge to this transfer of part of the "gain" to income, whereupon the auditing judge directed an apportionment under Nirdlinger's Estate, supra.

In our opinion the rule of Nirdlinger's Estate should not be applied where the salvage operation results in a profit. We believe that section 241 of the A. L. I. Restatement of Trusts should be restricted to the facts of Nirdlinger's Estate, to wit, to cases where net proceeds are not sufficient to restore principal and income.

The fundamental reason for the conclusion in Nirdlinger's Estate, as stated by Mr. Justice Schaffer was (p. 173) :

". . . the life tenants are the primary objects of the bounty of testators, and their incomes should be preserved to them, as far as it is possible to do so, even though it may result in ultimate diminishment of principal to be paid to far off remaindermen. Life tenants should not be required to starve in order that remaindermen may ultimately feast."

This reason does not exist where there is no income loss to the life tenants, they having been paid their interest in full.

It has long been the rule in Pennsylvania (Neel's Estate (No. 2), 207 Pa. 446, and Leech's Estate, 4 D. & C. 1) that profits and losses belong in principal account, because in the course of many transactions, through good times and bad, one will offset the other; or, stated in another way, the account which bears the losses should profit by the gains, and vice versa.

In recent years most salvage operations have resulted in a partial loss of principal and income. In considering the infrequent case of a profit, we should also bear in mind that there are also cases of complete loss, where good money has been thrown after bad, and the salvage operation has not paid expenses. Bolger, J., had such a case in the estate of Horatio C. Wood, deceased, April term, 1921, no. 209, where he declined to apply the rule of Nirdlinger's Estate, and to require life tenants to contribute to principal's loss. Judge Bolger said:

"To apply the rule of apportionment and to require the life tenant to share in the losses incurred would only further reduce his income and add to the starvation process, and to the further feasting of the remainderman. In like manner, should there be profits arising from the salvage operation, there would be no reason to apply this principle and apportion the profits, because, after all losses had been reimbursed to the life

tenant, there would not be involved the possibility of his starvation, and no reason for the interposition of the equitable doctrine would exist."

Our conclusion is, therefore, that out of the proceeds of the salvage operation, consisting of the net sale price and net rents, the trustee should pay to income account all delinquent interest at five percent (the rate which had been paid by the mortgagor) to the date of resale of the property, and the excess of net proceeds should be retained in principal account as a profit on the investment.

However, the six judges of this court being evenly divided in their opinion, the exception of the beneficiary will be dismissed.

*Re Compensation of Guardian and Trustee Ad Litem*

Exception is taken by the beneficiaries to the amount of compensation awarded to the guardian and trustee ad litem. This is a matter largely within the discretion of the auditing judge.

In Kenna Estate, 348 Pa. 214, Mr. Justice Allen M. Stearne said (p. 219) :

". . . such appointees are entitled to a fair, just and adequate compensation, measured by the quality of the work performed and the results obtained."

An examination of the record discloses that the allowance made by the auditing judge accords with this statement. The exception is dismissed.

The exception of the trustee is sustained, the exceptions of the beneficiaries are dismissed, and the adjudication is modified accordingly.

KLEIN, J., April 14, 1944.—

*Re Germantown Avenue and Rex Street Property*

I agree with the auditing judge that the apportionment formula set forth in section 241 of the A. L. I. Restatement of Trusts and adopted by our Supreme Court in Nirdlinger's Estate (No. 2), 327 Pa. 171 (1937),

should be applied in determining the proper allocation between principal and income of the proceeds of the sale of the foreclosed real estate. The fact that the property was sold at a price higher than its cost to the trust estate is, in my opinion, immaterial. Judge Ladner, in his adjudication, points out that the Restatement specifically covers this situation. Comment (*c*) to section 241 is as follows:

"(*c*) *Sale at Profit or Loss*—The rule stated in this section is applicable whether the amount received on the sale is greater or less than the value of the property at the time when the trust was created or when the property was acquired by the trustee."

The apportionment rule is one of expediency. It creates a completely new and artificial status for both income beneficiaries and remaindermen. Consequently, the many decisions handed down prior to the adoption of the rule, which, incidentally, are confusing and difficult to reconcile, are of little, if any, value in the present case.

Under the rule, the share of the income beneficiaries in the fund depends upon two factors: (*a*) the time which elapses until the salvage operation is completed; and (*b*) the current rate of return on trust investments. Therefore, to ascertain the percentage to which the income beneficiaries are entitled out of the proceeds of the sales, the time elapsed is multiplied by the current rate of return. The percentage thus fixed is independent of the rate of interest stipulated in the original mortgage or the amount realized from the sale of the foreclosed real estate.

This court has passed upon many accounts containing apportionment calculations since the Nirdlinger case was decided. It is only on the rarest occasions that the entire mortgage investment has been lost. On the other hand, it is also infrequent that the salvage operation realizes a surplus after principal is restored in full. In the vast majority of cases the net result is a diminu-

tion of corpus. In all of these cases the application of the apportionment rule is not only just and fair, but also practical and satisfactory from an accounting point of view. Therefore, in my opinion, to make a special rule for the exceptional situation in which the real estate is advantageously sold, as in the present case, would only unnecessarily complicate this already difficult problem.

In reviewing this adjudication we note that the auditing judge did not make a finding with respect to the current rate of return on trust investments in 1919, when the salvage operation took place, for the purpose of computing the apportionment according to the formula. In my opinion, five percent was the current rate of return in this period, and the auditing judge concurs in this view. I would, therefore, dismiss exception no. 8 filed by Porter F. Cope et al., and direct apportionment of the proceeds of the sale using five percent as the rate of return in making the necessary calculations. Judges Sinkler and Ladner join in this result.

LADNER, J., dissenting.—I dissent from the opinion of the majority insofar as it sustains the following exceptions:

## 1. *Exception to Surcharge re 5512 Woodland Avenue Mortgage*

The majority sustain the exception to the surcharge because the trustee's dereliction is said to have been a mere error in judgment. I believe there was infinitely more than a mere error of judgment. This because the trustee failed to ascertain essential facts upon which to base a judgment. Common skill, common prudence, and common caution require a trustee to ascertain with the reasonable diligence of an ordinarily prudent man all the facts necessary to be known before declining an offer for nonproductive property. This the trustee has neglected to do. To appreciate the extent of this trus-

tee's neglect in this regard, the facts found by the auditing judge must be stated more fully than in the majority opinion.

The trustee, in 1924, invested $5,500 in a first mortgage secured on 5512 Woodland Avenue, then appraised at $9,500. Four years later (March 7, 1927), W. Moeller, trustee's appraiser, reëxamined the property on an application for the extension of the loan, and then appraised it at $7,000, $2,500 value of ground and $4,500 of improvements. He reported the property had been vacant for two years and recommended the mortgage be called. On November 29, 1928, the same appraiser reported the dilapidated condition of the property in the following detail: "The heater is in poor condition, paper poor, most of it falling off; roof in poor condition and leaking; spouting rusted out; glass broken; bricks loose on chimney; frame of iron outside cellar door rusted out; tile loose and coming off bathroom; paint poor." The report adds: "Woodland Avenue in this section is dead. There are a number of vacant properties on Woodland Avenue from Fifty-third to Fifty-sixth. Most of them modern. *I do not think you could interest anyone in buying this property in its present condition. If repairs were made, and property put in fit condition, I doubt if you could get the cost out of it.*" Thus even a year before the financial collapse of 1929 the property was considered hopeless and without a future, and not likely to bring the investment.

The property was foreclosed in March 1929. It was estimated it would cost $700 to put the property in tenantable condition. There was no money available in the trust to make repairs. In fact, there was an overdraft therein due the trustee. Not being bound to advance its own money, there was no means of paying for repairs so the property continued vacant.

On May 26, 1930, trustee received an offer from Frederick Conard whose letterheads showed his busi-

ness to be that of a registered plumber. He offered $4,500 for the property "as is". The last previous appraisement was made two years before, at $7,000. The trustee was even then warned by that appraiser that the property could not be sold unless repaired and even then it was not likely that the cost could be realized, and that the neighborhood was dead. An ordinarily prudent man, with this warning before him, would have at once asked for a reappraisement and sought information as to whether conditions had become better or worse. But no new appraisement was directed by the trustee's officer in charge, and this despite the financial collapse of 1929 which intervened between the appraisement of 1928 and the offer in 1930. Then without any attempt to negotiate for a better offer, or ascertaining whether it was cash or not, or even quoting a counter-price, the accountant's officer tersely declined the offer. Would an ordinarily prudent man have so dealt with his own property? Had the trustee's officer in question examined its files, he would have seen the warning of the last appraiser who recommended the sale of the property as is. Surely such warning called loudly for a reëxamination and reappraisement in light of the offer and the possibility of further depreciation during the intervening two years. If the officer had looked at the files and failed to order a reappraisement, this was clear neglect. If he never looked at the files, then that was even worse neglect.

The suggestion that accountant's real estate officer (now deceased) was conversant with values and considered the property worth $7,000 is of little importance or weight. No real estate officer's armchair appraisement, if such there was under the circumstances here present, can excuse the failure to heed the warning in the trustee's own records of the actual appraisement made two years before.

Now, of course, no trustee should be surcharged for a mere error of judgment or because the market price

of trust property declined due to circumstances beyond his control. Here, however, the trustee was guilty of supine negligence. Even without the warning lodged in its records, there would have been doubt whether relying on the two-year-old appraisement made before the financial collapse of 1929 was an exercise of common skill, prudence, and caution.

Had the officer who received the letter from the businessman in question simply picked up the telephone, he could have learned what Mr. Conard later testified to before the court, that his offer contemplated the payment of all cash, and was in the highest degree bona fide. Surely no ordinarily prudent businessman would have refused such an offer offhand, especially where, as here, there was a history of long vacancy with no funds to put the property in a tenantable condition. Clearly this must be viewed as a case not of erroneous judgment, but as one wherein a disregard of the plain duty indicated by the circumstances of the case caused the loss. If authority be needed to support this proposition, it will be found in Hart's Estate (No. 1), 203 Pa. 480, 485, 486, and Chambersburg Savings Fund Association's Appeal, 76 Pa. 203.

The majority opinion attempts to bolster its argument by posing the question: "Suppose the property had been sold for $4,500, how could the trustee have met the reproach of the parties that it had been sold at a price far below the valuation which the trustee had put on it?" The answer to this question is clear. If the reappraisement had justified the sale, the trustee would have had absolute protection. Moreover, the record shows that this trustee had been requested by the life tenants to sell it at the first opportunity so as to convert a non-income-producing investment into an income-producing one. Consulting the life tenants upon receipt of the offer would have safeguarded the trustee against future complaints. The trustee, however, chose to brush the offer off without, so far as the

record shows, giving it any intelligent consideration. Thereafter the property remained vacant for eight years without any further offer until January 1939, when it was sold for $1,500 to a tenant to whom, in November 1938, it had been rented "as is" for $15 a month. If there can be no surcharge under the circumstances here recounted, then, no matter how carelessly a trustee handles matters of this kind, beneficiaries may always be denied justice on the specious plea that the trustee merely made an error of judgment.

I would dismiss the exception.