## Moffat Trust

*John W. Bour* and *William D. Morgan*, for petitioner.

*Joseph C. Kreder*, for respondent.

*Edwin M. Kosik*, guardian ad litem.

SIROTNAK, P. J., January 23, 1963.—On January 3, 1956, Charles H. Moffat, petitioner, was the owner of securities of an approximate value of $119,156.14. On that date, he, as settlor, executed a deed of trust by which he transferred to his father, John G. Moffat, and the Scranton Lackawanna Trust Company, as trustees, all of said securities, which are set forth in the schedule annexed to the deed of trust.

Petitioner was born on November 29, 1934, and on the date of the execution of the deed of trust he was 21 years and one month of age and single. On that date he was on active duty in the United States Navy and was stationed at China Lake, California, having enlisted on June 15, 1954. His father died on March 26, 1958, and under the terms of the trust agreement petitioner was appointed co-trustee of the trust. He is now married to Dorothy Chapin Moffat, who has joined in this petition. They have adopted a minor child who is now

seven years old. Petitioner seeks and respondent refuses to terminate the trust, respondent claiming it has no legal authority to do so.

Edwin Kosik, Esq., was appointed by the court as guardian ad litem for Millett Chapin Moffat, a minor, and trustee ad litem for unborn and unascertained interests.

Hearings were held and arguments were heard, at which time the question of the court's jurisdiction was raised, in view of the fact that the matter of this trust was not before the court. To avoid any question of jurisdiction, the matter was continued until a first and partial account was filed. The account was subsequently filed and the same was audited and adjudicated, wherein the trust res was awarded back to the trustees for further administration. Petitioner then filed an additional petition for citation to show cause why the testimony theretofore taken should not be used as the record to determine the question raised in the original petition filed for a citation to show cause why the trust should not be terminated. All parties in interest were served and notified and subsequently a stipulation was filed agreeing that the testimony theretofore taken be the record in this case and the matter be determined on that basis.

As the court stated in Fisher Estate, 26 D. & C. 2d 351, 359:

"It seems settled, however, that while the orphans' court is without jurisdiction to reform an inter vivos trust upon petition, it does have jurisdiction where an account has been filed for audit in that court by a trustee of such a trust.

"In Goldstein's Estate, 29 D. & C. 536 (1937), in which the validity of an inter vivos trust was at issue, our late colleague Judge Stearne, later elected to the Supreme Court, pointed out that once the orphans' court acquires 'rightful jurisdiction of a subject it will

comprehend that which is within its grasp and decide all matters necessary to enable it to make a full and final determination of the whole controversy, *although in so doing it may adjudicate questions which, if standing alone, would not warrant the assumption of jurisdiction.'* (Italics supplied.)

"And again, in Kenin's Estate, 41 D. & C. 572 (1941), when a similar problem was presented to our court, Judge Stearne said at p. 579:

" 'The jurisdiction of the orphans' court has been challenged to declare such a deed invalid. The orphans' court is a court of equity, with limited jurisdiction: Cutter's Estate, 286 Pa. 505; Watson's Estate, 314 Pa. 179; Mains' Estate, 322 Pa. 243. The Act of June 26, 1931, P. L. 1384, amending the Orphans' Court Act of June 7, 1917, P. L. 363, conferred concurrent jurisdiction over trusts inter vivos: Wilson, Mayor v. Board of Directors of City Trusts et al., 324 Pa. 545, 552 et seq. *When, therefore, the trustee filed its account in this court, the orphans' court assumed complete jurisdiction over the subject matter . . .'* "

Similarly, we are now in a position to consider the merits of petitioner's prayer for termination.

Paragraph tenth of the trust agreement provides that ". . . until March 2, 1966 this trust shall be irrevocable. . . ." Other pertinent provisions of the trust are herewith summarized.

The settlor provided for net income to himself quarterly, and after March 1, 1966, as much of the principal as requested in writing and any part of principal without request but in the discretion of the trustees for support, comfort and welfare. He then provided net income to his wife for her lifetime in quarterly payments in case of his death, and a discretionary provision for the trustees to invade the principal for the welfare of his wife and children and the education of his

children. Upon the death of the survivor of settlor and his wife, the principal is to be divided in equal shares so that there will be one share for each child of settlor either then living or then dead. The net income is to be payable quarterly to each child, with the right to withdraw one-fourth of the principal at age 25 and the balance at age 30, with discretion in the trustees to invade the principal for the welfare and education of each child. Upon the death of a child or in case of the previous death of a child, the issue of such child is to take per stirpes, or in default of issue the then living issue of settlor is to take per stirpes, or in default of such issue, then the then living issue of the parents of settlor are to take, or in default of such issue, then the father of settlor is to take, and if he is not then living, then the D. M. Sterns Missionary Fund, of Philadelphia, Pennsylvania, is to take. Provision is also made for minor and disabled beneficiaries and for payment to them, with a further provision for non-anticipation or alienation, voluntary or involuntary. There are further provisions governing taxes, powers of the trustees, investments and the designation of trustees.

The central issue before the court is whether respondent may legally resist petitioners' efforts to terminate the trust. As the Supreme Court said in Scholler Trust, 403 Pa. 97, 102:

". . . Since the intention of the settlor is the guide primarily to be followed in construing a deed of trust, Scott's Trust, 322 Pa. 1, 184 Atl. 245 (1936), we have scrutinized the entire record for evidence of such intent . . . Since a court, in an effort to ascertain a settlor's intent, may look beyond the deed itself to contemporaneous circumstances, Wolters Estate, 359 Pa. 520, 59 A. 2d 147 (1948), . . ."

We have read and re-read the entire record and have no doubt, based upon applicable law, that petitioner is entitled to the relief prayed for, i.e., the termination of

his trust. Parenthetically, we add that the court is indebted to all counsel for the very learned and scholarly briefs submitted by them.

Petitioner testified that he was married on January 30, 1960, and lives harmoniously with his wife. In 1960, they adopted a child, now seven years old. In 1955, while on leave from the United States Navy, he discussed the creation of a trust with his father, who possessed and managed his securities. His father, who had had a heart attack, suggested an agency to help manage petitioner's securities. Toward the end of that year a written trust agreement was mailed to him at United States Naval Station, China Lake, California. He did not "well understand" it when he signed it and he did not "realize the trust was irrevocable." He was under the impression that after his naval service he could take his money and do with it as he saw fit. He thought the bank would handle his securities as an agency and he had just learned that he could not cancel the agreement when his father died on March 26, 1958, about two months before his active service ended, at a conference with Mr. A. D. Hemelright, vice president of the trust company. He feels he can now properly handle his own financial affairs, since he is associated with a brokerage office and has studied security analysis with the American Institute of Finance. He is dissatisfied with the trust arrangements in the event of his own death, in view of his own family obligations, and has never heard of the Sterns Missionary Fund mentioned in the trust. His father told him the trustee would continue the management of his affairs as he was doing for him and that he could obtain funds from the trust for any purpose.

On cross examination, he testified he had attended St. Paul's Preparatory School and had spent two years at Duke University; that he had received the securities principally from his parents; and when he enlisted in

the Navy he had had no marriage plans and now plans to have more children.

On redirect examination, he testified he never consulted the attorneys who had prepared the trust and did not discuss the contents of the trust agreement with either Mr. Hemelright or Mr. Dodge, officers of the trust company. He said he always felt the principal would be available to him when he needed the money, as had been the situation when his father had handled his funds, and that the written trust agreement had only put in writing the same oral arrangement he had had with his father.

Respondent submitted there was no need for it to offer any testimony, since it was simply designated a trustee; and that it had not arranged the preparation of the trust agreement, which was drafted by . . . Philadelphia attorneys, for petitioner's father.

At another hearing on February 8, 1962, respondent offered in evidence its exhibit no. 1, a photostatic copy of a letter from [the Philadelphia attorney] of December 12, 1955, to Mr. J. G. Moffat, petitioner's father, which states, inter alia, as follows:

"The trust, under Article Tenth, is irrevocable until March 2, 1966, and is revocable thereafter. We made the trust irrevocable for a period of time on the assumption that your son would wish to tie up the fund until he is somewhat older and in a position to manage it with more mature judgment.

"We have chosen the date of March 2, 1966, in order to make sure that the trust will be irrevocable for a period of over ten years after the probate date of the execution of the deed. By making the trust irrevocable for over ten years we will avoid the possibility of capital gains being taxed to your son under present tax laws. Even though the trust will be irrevocable for a period of time, since your son's life expectancy is substantially greater than the period of irrevocability we do not be-

lieve that the creation of his trust involves the necessity of your son's filing a gift tax return with respect to it, since under this sort of trust no 'gift' is being made, within the definition of the federal gift tax legislation."

Respondent also offered a letter of December 20, 1955, of Mr. Hemelright to petitioner wherein it states, inter alia:

"At the request of your father, we are enclosing in triplicate copies of a Trust Agreement prepared by [the Philadelphia attorney] for your consideration. Your father and I have studied it carefully and feel that it is in order . . ."

In rebuttal, petitioner testified that he never discussed with anyone what was to happen to the corpus of the trust after his death, what would happen if he were survived by a wife, about the division or distribution to any children; that he had never heard of a D. M. Sterns Missionary Fund; that he never discussed with anyone the tax consequences of the trust or that it would be irrevocable; that he did not retain [the Philadelphia attorney] to prepare the trust and never dealt with him or his firm; that he signed the agreement because his father "okayed it"; and that he did not intend the trust to be irrevocable.

Petitioner called Robert Margolis, Esq., a member of the Northampton County bar and a certified public accountant and tax consultant from Bethlehem, Pennsylvania, who was shown the letter from [the Philadelphia attorney] supra. He testified that he had studied and examined the trust and expressed his opinion that there was no tax saving whatsoever to the settlor; that in a study of old tax memoranda, including reviews, periodicals, etc., he found nothing to support the view that the creation of a trust for a period of more than ten years, or a so-called Clifford Trust, was a device or instrument to place capital gains in the

hands of the trustee rather than the income beneficiary, where settlor was the income beneficiary, as in this trust. This is contra to the scrivener's opinion that it would be taxable to the trust rather than to settlor, supra.

We see nothing in the record which indicates that petitioner at age 21 had any knowledge that his obvious intention to create a management trust could be fulfilled by a revocable trust. Moreover, it is a singular fact that no one pointed out to the young settlor of the trust that he could choose between a revocable and an irrevocable trust, and that his right to revoke would not in any way upset or defeat his avowed purpose of providing for the management of his securities while he was in active service in the United States Navy. Respondent's transmittal letter contains no explanation for settlor's study. This supports the statement of petitioner when he said he followed his father's instructions explicitly.

We need not decide what effect the notions of the scrivener relative to the trust, as contained in his letter to petitioner's father, supra, had upon the matter generally, and we are not unmindful that settlor now has his own family. Under the trust settlor's death would produce a life estate to his widow, with the remainder to other persons whom he has no present desire to benefit. The court is aware of the ruling in Loughran v. Scranton Lackawanna Trust Company, et al., no. 17, September term, 1939, in the Court of Common Pleas of Lackawanna County, in equity.

Petitioner's testimony that his understanding of the trust agreement was imperfect is clear and convincing. It is not necessary to indulge in speculation as to whether petitioner understood the legal significance of the scrivener's language as used in the deed of trust. He testified that he signed the trust agreement upon its receipt from respondent because he relied upon his

father's "okay" of the document. Even if he understood that he had made his trust irrevocable until March 1, 1966, the failure to enlighten him that a revocable trust could fulfill his purpose of management is fatal and is the legal basis for the relief he now seeks, the termination of the trust. See Miskey's Appeal, 107 Pa. 611. We do not agree with respondent that this trust cannot be legally terminated before March 1, 1966. We are guided by the early and leading case of Russell's Appeal, 75 Pa. 269, 279, wherein the court said:

" '. . . The first thing which the court seeks to discover is the intention of the settlor, and the deed is accepted as expressive or conclusive of that intention, only when it is shown that it was executed not only freely and deliberately but with full knowledge, and the *onus probandi* is on the party seeking to uphold it. The general rule is, "that in every transaction in which a person obtains by voluntary donation a benefit from another, it is necessary that he should be able to establish that the person giving him that benefit did so voluntarily and deliberately, knowing what he was doing, and if this be not done, the transaction cannot stand" . . . the question is, . . . "whether the deed fully expresses the nature of the arrangement she (the settlor) wished to make, . . ." It is not enough to show that the settlor read the deed, or that it was read to him, or that he understood it "as well as any unprofessional man could be supposed to do," but it must be established that it was so explained to him that he might understand it . . . ". . . And where the circumstances are such that the donor ought to be advised to retain a power of revocation, it is the duty of a solicitor to insist upon the insertion of such power, and the want of it will, in general, be fatal to the deed." . . . "The rule now is, that in cases where it would have been more prudent to insert a power of revocation, the absence of it will be a great

mark of fraud, and that it is the duty of the solicitor who draws the deed almost to insist on the donor retaining the power of varying or revoking the gift, especially if it comprises a great part of the donor's property; and that a gift without such power cannot be upheld without very clear proof (and the *onus probandi* is on the donee) that the transaction was fully understood and was intended to be irrevocable . . ." . . . "where, in a voluntary settlement of real estate, a revocable deed would have answered the settlor's purpose as well as an irrevocable one, the absence of a power of revocation is prima facié evidence of mistake, and that evidence can only be rebutted by showing that the settlor had his attention pointedly called to the fact that the instrument was irrevocable, and that he could have equally effected his purpose by a revocable one." . . . it is no part of the present argument that every voluntary settlement, to be valid, should contain a power of revocation. There are cases in which it would not only not be prudent to insert such a power, but the insertion of it would invite, if not promote, what the settlement was intended to prevent, . . .

" 'The argument here is only this: That in cases where the purpose of the settlement could be as effectively accomplished by a revocable as by an irrevocable deed, it must be clearly shown by the party who would uphold the deed, that it was meant by the settlor to be irrevocable . . .' "

### Decree

Now, January 23, 1963, we therefore grant the prayer of the petition, and it is ordered, adjudged and decreed that the trust agreement executed by petitioner be and it is hereby terminated, and Charles H. Moffat and Northeastern Pennsylvania National Bank and Trust Company, successor trustees as aforesaid, are directed to distribute the trust assets in their possession to Charles H. Moffat, settlor, after deducting therefrom

the expenses of administration and such other costs and expenses as are allowed at the audit of the final account of said trustees to be filed forthwith.